**Brian M. CAMPBELL, et al., Plaintiffs,**

v.

**CIVIL AIR PATROL, et al., Defendants.**

No. Civ.A. 99–D–2–N.

United States District Court, M.D. Alabama, Northern Division.

Feb. 13, 2001.

Jay Lewis, Terry R. Smyly, Montgomery, AL, for plaintiffs.

Kenneth E. Vines, Office of the United States Attorney, Montgomery, AL, David J. Middlebrooks, Sally B. Waudby, Kimberly K. Boone, Lehr, Middlebrooks, Price & Proctor, Birmingham, AL, Brent L. Crumpton, Crumpton Edge, Birmingham, AL, for defendants.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court are the following two motions: (1) a Renewed Motion To Dismiss Or, In The Alternative, Motion For Partial Summary Judgment (Doc. No. 35), filed July 1, 1999, by Civil Air Patrol ("CAP"), Paul J. Albano ("Albano"), Robert Brooks ("Brown") and H.D. Brown ("Brown") (collectively, the "CAP Defendants"); and (2) a Renewed Motion To Dismiss Or, In The Alternative, Motion For Partial Summary Judgment (Doc. No. 36), filed July 1, 1999, by Dennis Parkhurst ("Parkhurst") and F. Whitten Peters ("Peters") (collectively, the "Air Force Defendants").[1] On July 15, 1999, Plaintiffs

---

1. While the Air Force Defendants have titled their alternative motion as a Motion For Summary Judgment, they do not request summary judgment on all claims. Accordingly, the court will refer to the Air Force Defendants' alternative Motion as a Motion For Partial Summary Judgment.

Brian M. Campbell ("Campbell") and Christopher C. Shaw ("Shaw") (collectively, "Plaintiffs") filed a Consolidated Response to the CAP and Air Force Defendants' Motions. In an Order entered on February 3, 2000, the court construed the CAP and Air Force Defendants' Motions as Motions For Partial Summary Judgment and gave the Parties an opportunity to present all relevant materials on the Motions. *See* FED.R.CIV.P. 12(b). The parties have responded, and the issues presented are ready for determination. After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that the CAP and Air Force Defendants' Motions are due to be granted.

## I. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction). The Parties do not contest personal jurisdiction or venue.

## II. SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

trial. In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing FED.R.CIV.P. 56(c)).

The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.'" That there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (citing FED. R.CIV.P. 56(c)). The mechanics of satisfying the initial burden vary, however, depending upon which party, the movant or the nonmovant, bears the burden of proof at trial. *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993) (detailing the nature of the parties' responsibilities when preparing or defending against a motion for summary judgment).

Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"

*Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (citing Fed.R.Civ.P. 56(e)). In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348; *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

## III. BACKGROUND

### A. *Introduction*

Plaintiffs bring this action asserting that CAP, in conjunction with the Air Force, fired them for speaking out against what they perceived as discrimination in the workplace. Plaintiffs name the following Defendants: (1) CAP; (2) Albano, the Executive Director of CAP; (3) Brooks, the Assistant Executive Director of CAP; (4) Brown, the Director of Personnel of CAP; (5) Parkhurst, an Air Force Colonel appointed as the Commander of CAP–USAF [2] by the Secretary of the Air Force to serve as a liaison to CAP; and (6) Peters, the Secretary of the United States Air Force. (2nd Am.Compl. ¶¶ 5–10; Parkhurst Decl. ¶ 1.)

Both Campbell and Shaw assert claims alleging constitutional violations (Counts 1–6), conspiracy under 42 U.S.C. § 1985 ("§ 1985") (Counts 7–8), conspiracy under state law (Counts 11–12), and wrongful neglect under 42 U.S.C. § 1986 ("§ 1986") (Counts 9–10). (*Id.* ¶¶ 43–118.) Campbell also brings a claim under the retaliation provision of Title VII of the Civil Rights Act of 1964, as amended (Count 13). (*Id.* ¶¶ 119–122); 42 U.S.C. § 2000e–3(a).

The CAP and Air Force Defendants move for summary judgment on all counts, except the Title VII count (Count 13). As to the constitutional claims (Counts 1–6), the CAP and Air Force Defendants' primary argument is that CAP is not a federal actor under any of the tests set out by the Supreme Court of the United States. Accordingly, the CAP and Air Force Defendants contend that CAP's alleged unconstitutional actions cannot be attributed to the federal government and that, absent federal action, Plaintiffs cannot bring constitutional claims against CAP, its employees, or the Air Force Defendants. Further, the CAP and Air Force Defendants challenge the viability of Plaintiffs' federal- and state-law conspiracy claims (Counts 7–8, 11–12), as well as Plaintiffs' § 1986 claims (Counts 9–10).

### B. *Plaintiffs' Claims*

Shaw began his employment with CAP on January 14, 1995, as a Cadet Programs Manager. He worked in this position until his transfer to the Marketing and Public Relations Directorate, where he served as Chief of Multimedia Productions. Shaw was terminated from employment with CAP on August 28, 1998. Campbell worked for CAP as a Cadet Programs Developer/Registrar from September 15, 1997, until he was fired on October 16, 1998. (2nd Am.Compl.¶¶ 21, 29, 33.)

During Shaw and Campbell's employment, two CAP employees—Lori A. Swanson ("Swanson") and Douglas G. Isaacson ("Isaacson")—brought lawsuits against CAP, alleging discrimination in violation of Title VII. (*Id.* ¶¶ 31, 41); *see generally Swanson v. Civil Air Patrol,* 37 F.Supp.2d 1312 (M.D.Ala.1998). Albano, Brooks and Brown instructed Plaintiffs, as well as other CAP employees, "to refrain from commenting on or expressing [ ] opinion[s] about … sexual harassment, discrimination, and retaliation at CAP headquarters," and, specifically, about Swanson and Isaacson's cases.[3] (2nd Am.Compl.¶¶ 23, 35.)

---

**2.** USAF stands for "United States Air Force."

**3.** The court will refer to Albano, Brooks and Brown's instructions as the "no-talk" directive or the "no-talk" order.

Parkhurst later became aware of Albano's "no-talk" order. (Parkhurst Decl. ¶ 4.) Additionally, on May 27, 1998, Albano held a meeting with the CAP Cadet Programs Directorate, during which Albano informed Campbell and other employees that he had fired Isaacson and instructed them "not to discuss the subject matter of Isaacson's termination with each other .or with any attorneys representing Isaacson." (*Id.* ¶ 24.)

Subsequently, Albano held a similar meeting with the Marketing and Public Relations Directorate, where Shaw worked, and told the employees that he had fired Isaacson. (*Id.* ¶ 36.) Albano instructed Shaw, as he had instructed Campbell, "not to discuss the subject matter of Isaacson's termination with anyone except CAP's attorneys" and, specifically, was told not to talk to Isaacson's attorneys. (*Id.*)

On other occasions as well, Albano and Brooks "instructed" Plaintiffs and CAP employees "to refrain from discussing with anyone, including attorneys representing parties adverse to CAP, the cases of either Isaacson or ... Swanson." (*Id.* ¶¶ 25, 37.)

Shaw and Campbell abided by these instructions for a time. (*Id.* ¶¶ 26, 38.) On July 23, 1998, however, Shaw voiced his opinions on CAP-TALK "about sexual harassment, sex discrimination, racial discrimination, and retaliation at CAP." (*Id.* ¶¶ 26, 38.) CAP-TALK is an internet website designed for "the expression of opinions and exchange of information about matters of concern to CAP members and leaders." (*Id.* ¶¶ 27, 39.) Campbell did the same on October 12, 1998. (*Id.* ¶ 38.) After Shaw sent his message on CAP-TALK, he told Brooks "what he had done." (*Id.* ¶ 38.) Thereafter, on August 28, 1998, Shaw was fired. (*Id.* ¶ 40.) Similarly, on October 13, 1998, the day after Campbell voiced his opinion on CAP-TALK, Brooks called Campbell into his office. Brooks showed Campbell "a copy of the message [Campbell] had posted on CAP-TALK," and "Campbell confirmed that he had written the message." (*Id.*

¶ 28.) Campbell told Brooks that he sent the message, in part, "because he had become 'fed up' with the treatment of Swanson and Isaacson." (*Id.*) Three days after this meeting, Brown fired Campbell. (*Id.* ¶ 29.)

As a result of the foregoing, Campbell and Shaw commenced this civil action. In Count 1, Campbell brings a First Amendment prior restraint claim against all Defendants, except Peters. (*Id.* ¶¶ 50–56.) He asserts that CAP, through its agents (including Albano, Brooks and Brown), prohibited Campbell from commenting on Swanson and Isaacson's cases and the alleged discrimination giving rise to their lawsuits. (*Id.* ¶¶ 43, 45.) Further, Campbell predicates Parkhurst's liability on the fact that he "was aware of the orders given by CAP to its employees and acquiesced in and agreed to those orders." (*Id.* ¶ 44; Parkhurst Decl. ¶ 4.) Campbell contends that CAP's "orders" constitute a prior restraint on his First Amendment free speech rights. (*Id.* ¶¶ 46–47.) In Count 2, Shaw brings an identical claim against the same Defendants. (*Id.* ¶¶ 50–56.)

In Count 3, Campbell sets forth a First Amendment retaliation claim against all Defendants. Shaw alleges the same claim in Count 4. Plaintiffs assert that they were terminated from employment in retaliation for commenting on the internet (i.e., on CAP-TALK) about CAP's alleged discriminatory practices pertaining to Swanson and Isaacson. (*Id.* ¶¶ 57–76.)

In Count 5, Campbell brings both a substantive and procedural due process claim, presumably under the Fifth Amendment, *see infra* footnote 7. First, Campbell asserts that the CAP and Air Force Defendants violated his substantive due process rights by firing him in retaliation for the exercise of his First Amendment rights. (*Id.* ¶¶ 77–80.) Second, Campbell contends that, in contravention of his procedural due process rights, the CAP and Air Force Defendants "deprived [him] of the opportunity for a hearing, for representation, or for an appeal of the termination to an

impartial tribunal, as no such effective appeal or grievance process exists within CAP." (*Id.* ¶ 81.) Shaw brings the same two due process claims in Count 6. (*Id.* 84–90.)

In Counts 7 and 8, respectively, Campbell and Shaw each bring a conspiracy claim under 42 U.S.C. § 1985. (*Id.* ¶¶ 91–102.) Plaintiffs allege that Albano, Brooks, Brown, CAP and Parkhurst conspired to deprive them of their rights protected under the First and Fifth amendments, namely, their "rights to free expression ..., equal protection of the law, equal privileges and immunities under the laws, and substantive and procedural due process." (*Id.* ¶¶ 91, 94, 97, 100.) Moreover, Plaintiffs contend that these Defendants conspired to deprive Plaintiffs of their "position[s] of employment," in which they claim a property interest. (*Id.* ¶¶ 92, 98.)

In Counts 9 and 10, Plaintiffs bring claims against all Defendants for wrongful neglect cognizable under § 1986. (*Id.* ¶¶ 103–108.) In Counts 11 and 12, Plaintiffs assert state law conspiracy claims. (*Id.* ¶¶ 109–118.) Finally, in Count 13, Campbell brings a Title VII retaliation claim. (*Id.* ¶¶ 119–122.)

As relief, Plaintiffs request a declaratory judgment, injunctive relief, compensatory damages, punitive damages, back pay, and reinstatement or front pay. (*Id.* at 28–33.)

**4.** As a corporation, CAP, among other things, may adopt a constitution, bylaws, and regulations; acquire, own, lease, encumber, and transfer property as necessary to carry out the purposes of the corporation; and may "sue and be sued." 36 U.S.C. § 40304. CAP, however, "may not engage in business for profit or issue stock." *Id.* § 40305.

**5.** In referring to the Parties' submissions in support of and in opposition to the Motions For Partial Summary Judgment, the court shall refer to the docket numbers assigned to those pleadings (i.e., "Doc.No.").

**6.** A Memorandum of Understanding ("MOU") entered between CAP and the Air Force expounds upon CAP's role as a "civilian auxiliary":

### C. The Purposes of the Civil Air Patrol And Its Relationship With the United States Air Force

CAP, whose national headquarters is located at Maxwell Air Force Base, Montgomery, Ala., is a private, "federally chartered corporation."[4] 36 U.S.C. § 40301; (2nd Am.Compl. ¶ 5; Doc. No. 35, Ex. 1 at 2.[5]) CAP's role is set out in 36 U.S.C. § 40302, which provides that:

The purposes of [CAP] are to—

(1) provide an organization to—

· (A) encourage and aid citizens of the United States in contributing their efforts, services, and resources in developing aviation and in maintaining air supremacy; and

(B) encourage and develop by example the voluntary contribution of private citizens to the public welfare;

(2) provide aviation education and training especially to its senior and cadet members;

(3) encourage and foster civil aviation in local communities; and

(4) provide an organization of private citizens with adequate facilities to assist in meeting local and national emergencies.

36 U.S.C. § 40302.

CAP also is "a volunteer civilian auxiliary of the Air Force." 10 U.S.C. § 9441(a). As an auxiliary, CAP performs noncombat missions of the Air Force, when requested to do so by the Secretary of the Air Force.[6] *Id.* § 9441(c). "An Air Force

C. Definitions

1. Air Force Civilian Auxiliary:

a. A private organization that is organized and equipped to provide specified support and services to the Department of the Air Force, and to pursue its statutory objectives.

b. The Civil Air Patrol has been designated by statute as a volunteer civilian auxiliary of the Air Force, and is organized to provide trained volunteers in emergency services and aerospace education and training for senior and cadet members.

(MOU, ¶ C.1.a.) The MOU is attached as Exhibit 1 to Document Number 38 and as Exhibit 4 to Document Number 35.

noncombat mission is any mission for which the Air Force is tasked, by statute, regulation, or higher authority, which does not involve actual combat, combat operations, or combat training." (MOU, ¶ C.3.a.) For example, Air Force non-combat missions which CAP performs include search and rescue training and operational missions, disaster relief training and operational missions, support of the military during national emergencies, and CAP cadet orientation flights. (MOU, ¶ D.) When the Secretary employs CAP to fulfill noncombat Air Force missions, CAP is considered "an instrumentality of the United States" for purposes of determining civil liability (including damages) under the Federal Tort Claims Act. 10 U.S.C. § 9441(c). "All other missions performed by [CAP] are considered corporate missions, over which the Air Force exercises no control." (MOU, ¶ D.1.e.)

To assist CAP in meeting its objectives, the federal government, through the Secretary of the Air Force, provides substantial funding and other support. The Secretary of the Air Force supplies CAP with (or reimburses CAP for the cost of) aircraft, motor vehicles, communications equipment, fuel and lubricants, and cadet uniforms. *See* 10 U.S.C. § 9441(b). Additionally, the Secretary of the Air Force provides funding to CAP for travel expenses of CAP members in times of war or during national emergencies; for staff compensation, benefits, administrative expenses, travel, per diem, rent and utilities incurred at CAP's national headquarters; for aircraft maintenance and fuel "relating to operational missions, unit capability testing missions, and training missions"; and for servicing expenses for CAP's equipment, including aircraft, motor vehicles and communications equipment. *See id.* The federal government also permits CAP to use Air Force services and facilities needed by CAP to carry out its mission and also assists CAP in training. *See id.*

Moreover, the federal government and, in particular the Air Force, heavily regulates CAP. For instance, CAP is required

to submit an annual report to Congress on its activities performed in each fiscal year. *See* 10 U.S.C. § 40307. Although CAP is headed by a civilian volunteer who holds the office of National Commander, CAP is governed by the National Board and the National Executive Committee, consisting of CAP members and the CAP–USAF Commander. (Doc. No. 38, Ex. 8.) The CAP–USAF Commander acts as a bridge between CAP and the Air Force to oversee Air Force support for CAP. (Parkhurst Decl. ¶ 1.)

While the Air Force provides oversight, assistance and support to CAP, the Air Force is not involved in CAP's personnel matters. (*Id.*) As explained by Parkhurst, the CAP–USAF Commander,

> CAP is a private organization with its own corporate management. I have no command authority over CAP Headquarters personnel. I can make suggestions on proposed courses of action, but I cannot direct them. I cannot give orders to any member of the CAP Headquarters management team, and I have no authority to hire or fire CAP personnel. These are decisions made by CAP leadership.

(*Id.* ¶ 2.) Moreover, Parkhurst explains his role in the decisions that are at issue in this case. First, as to the "no talk" directive, Parkhurst states as follows:

> As the Isaacson and Swanson cases were progressing toward trial, I attended a CAP Headquarters staff meeting. During this meeting, I heard that CAP management had instructed CAP employees not to discuss the pending litigation. CAP management did not ask for my concurrence or approval of their decision to issue the "no-talk" directive, and I did not offer any comment as I believed it to be a matter falling squarely within their area of authority and not mine. Some time well after the "no-talk" directive had been given, I mentioned to the CAP Director, Paul J. Albano, Sr., that this approach seemed consistent with what I believed the

course the Air Force would take to pending litigation.

(*Id.* ¶ 4.)

Second, regarding Plaintiffs' terminations, Parkhurst declares as follows:

> I never attended any meeting, took part in any discussion, or participated in any way in the decisions to terminate [Plaintiffs]. CAP management did not consult me or seek my concurrence or approval either before of after they took these actions. I only heard about the terminations some time after they occurred and I was only told for informational purposes. Upon learning of the terminations, I took no action because the hiring and firing of CAP Headquarters employees is a matter beyond the scope of my authority.

(*Id.* ¶ 5.)

## IV. DISCUSSION

### A. *Bivens' Lawsuits and the Governmental Action Requirement (Counts 1–6)*

■ In Counts 1–6, Plaintiffs allege violations of the First and Fifth amendments pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).[7] (2nd Am.Compl.¶ 11.) To maintain an action under *Bivens*, there must be a showing that the defendant acted under color of federal law, i.e., engaged in federal action.[8] *See Bivens*, 403 U.S. at 392, 91 S.Ct. 1999; *see also Public Utilities Comm'n v. Pollak*, 343 U.S. 451, 461, 72 S.Ct. 813, 96 L.Ed. 1068 (1952) (The First and Fifth amendments restrict actions of the federal government, not actions of private persons.); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). Thus, to prove their *Bivens* claims, Plaintiffs must show that CAP's alleged unconstitutional actions are the product of federal governmental action.

■ In moving for summary judgment, the CAP and Air Force Defendants argue that Plaintiffs have failed to demonstrate that CAP is a governmental actor. Plaintiffs disagree, and they particularly focus on Parkhurst's oversight of CAP, as well as CAP and the Air Force's interdependence.

There are three methods by which Plaintiff may prove governmental action. Specifically, based upon review of Supreme Court precedent, the Eleventh Circuit has extracted three tests used by the Supreme Court in evaluating whether there is state or federal action. *See National Broadcasting Co., Inc. v. Communications Workers of America, AFL—CIO*, 860 F.2d

---

7. Plaintiffs also reference the Fourteenth Amendment. (2nd Am.Compl.¶¶ 3, 4, 11, 14.) The Fourteenth Amendment, however, applies to actions by a State. *See Buxton v. City of Plant City*, 871 F.2d 1037, 1041 (11th Cir. 1989) ("The fifth amendment to the United States Constitution restrains the federal government, and the fourteenth amendment ... restrains the states, from depriving any person of life, liberty, or property without due process of law."). The claimed association in this case is between CAP and the federal government. Plaintiffs have made no allegations regarding state government. Therefore, the Fourteenth Amendment is inapplicable in this action.

8. In *Bivens*, the Supreme Court of the United States authorized a constitutionally implied damages action against individual federal officials for infringement of Fourth Amendment rights that is comparable in form to the con-gressionally authorized action against state officials under § 1983. Courts have since expanded the *Bivens'* remedy to allow direct actions under other constitutional provisions, including the First and Fifth amendments. *See Morast v. Lance*, 807 F.2d 926, 930 (11th Cir.1987). Because the causes of action under *Bivens* and § 1983 are very similar, courts generally apply § 1983 law to *Bivens* cases. *See id.; see also Bolin v. Story*, 225 F.3d 1234, 1241–42 (11th Cir.2000) (per curiam); *Wilson v. Blankenship*, 163 F.3d 1284, 1288 (11th Cir.1998); *Overton v. John Knox Retirement Tower, Inc.*, 720 F.Supp. 934, 940 (M.D.Ala.1989) ("For analytical purposes, the fact that the alleged governmental action hinges on a federal, rather than state, nexus has no significance."). Thus, in analyzing Plaintiffs' *Bivens* claims, the court shall refer interchangeably to cases decided under both § 1983 and *Bivens*.

1022, 1025 (11th Cir.1988). These tests are "(1) the public function test; (2) the state compulsion test; and (3) the nexus/joint action test." *Id.*

First, under the public function test, "state action has been limited strictly, and covers only private actors performing functions 'traditionally the exclusive prerogative of the State.'" *NBC,* 860 F.2d at 1026 (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 353, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)). The Supreme Court's holdings "have made clear that the relevant question is not simply whether a private group is serving a 'public function.'" *Rendell–Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (citation omitted). Exclusivity is the key. To constitute federal action, "private conduct must not only comprise something that the government traditionally does, but something that only the government traditionally does." *Edmonson,* 500 U.S. at 640, 111 S.Ct. 2077 (dissenting opinion). "[W]hile many functions traditionally have been performed by governments, very few have been exclusively reserved to the state." *Carlin Communications, Inc. v. Southern Bell Tel. and Tel. Co.,* 802 F.2d 1352, 1361 (11th Cir. 1986) (citing *Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)).

Second, the state compulsion test looks to "whether the state has exercised coercive power or has provided such significant encouragement, either overt or covert, that the private actor's choice must be deemed to be that of the state." *Langston v. ACT,* 890 F.2d 380, 385 (11th Cir.1989); *see also NBC,* 860 F.2d at 1026.

Third, "[t]he nexus/joint action test finds state action where '[t]he state has so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the challenged activity.'" *Patrick v. Floyd Medical Center,* 201 F.3d 1313, 1315 (11th Cir.2000) (quoting *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)).

Plaintiffs argue that application of all three tests leads to the conclusion that CAP is a governmental actor. First, under the public function test, Plaintiffs argue that CAP's duties pertaining to air searches, rescue operations and drug interdiction are "traditionally exclusive government functions." [9] (Doc. No. 38 at 8.) Second, Plaintiffs contend that Parkhurst acquiesced in CAP's decision to issue the "no-talk" order and to terminate Plaintiffs. (Doc. No. 38 at 2, 11.) Defendants' actions arguably satisfy the state compulsion test.

Further, under the nexus/joint action symbiotic relationship, Plaintiffs have set forth numerous facts demonstrating the close relationship between CAP and the Air Force. (Doc. No. 38 at 10–13.) For example, Plaintiffs describe CAP's role in assisting Air Force activities, such as cadet orientation flights, disaster relief, and drug interdiction. (*Id.* at 10.) Plaintiffs point out that CAP and Air Force officers share working space with CAP employees, that Parkhurst works at CAP's national headquarters in Montgomery, and that CAP uses federal property. (*Id.* ¶¶ 10–11, 13.) Moreover, Plaintiffs stress that the federal government provides CAP with substantial financial assistance, coupled with federal regulation of CAP's activities. (*Id.* ¶¶ 6–7.) Based on these facts, Plaintiffs contend that "[i]t is clear that CAP's mutual involvement with the United States Air Force is more than sufficient to qualify as a symbiotic relationship." (Doc. No. 38 at 13.)

Given Plaintiffs' arguments, the question is: Under any of these three tests, is CAP's relationship with the Air Force,

---

9. During the time frame which gave rise to the alleged constitutional violations, CAP assisted the Air Force in drug interdiction and eradication. *See* Pub.L. No. 100–690, Title VII, § 7606, Nov. 18, 1988, 102 Stat. 4511, as amended Pub.L. No. 104–106, Div. A, Title XV, § 1502(f)(4), Feb. 10, 1996, 110 Stat. 509, § 7606. In 1999, § 1502(f)(4) was repealed. *See* Pub.L. No. 106–65, Div. A, Title X, § 1032(b)(3), Oct. 5, 1999, 113 Stat. 751.

and, in particular, with Parkhurst, such that CAP can be considered a federal government actor? The answer is "No."

Even taking Plaintiffs' characterization of the Air Force's relationship with CAP as true, the court finds that CAP's actions are not attributable to the federal government. Namely, Plaintiffs' arguments as to each test fail on one single, but crucial point. Under each of these three tests, as set out below, the governmental action must be directly linked to the alleged unconstitutional conduct. *See generally Carlin Communications, Inc.*, 802 F.2d at 1357 ("The Supreme Court's decisions ... have made it clear that in order to establish state action the plaintiff must show that the state is responsible for the specific conduct of which he complains.") (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)).

First, under the public function analysis, the Supreme Court in *Blum* intimated that the public function analysis requires a plaintiff to demonstrate that the specific alleged unconstitutional actions constitute actions which are 'traditionally the exclusive prerogative of the [the federal government].' *NBC*, 860 F.2d at 1026 (quoting *Jackson*, 419 U.S. at 353, 95 S.Ct. 449). In other words, "the Court suggested that the analysis should involve review of the alleged misconduct, and not just the overall function of the alleged state actor." *Haavistola v. Community Fire Co.*, 6 F.3d 211, 216 (4th Cir.1993).

In *Blum*, the issue was "whether a private nursing home's decision to discharge or transfer a Medicaid patient satisfies the state-action requirement of the Fourteenth Amendment." 457 U.S. at 1012, 102 S.Ct. 2777 (White, J., concurring). The plaintiffs "challeng[ed] decisions by the nursing homes in which [they] reside[d] to discharge or transfer patients without notice or an opportunity for a hearing." *Id.* at 993, 996, 102 S.Ct. 2777. The plaintiffs argued that, because the State of· New York was responsible by law "for providing every Medicaid patient with nursing home services," the nursing home provided

a public function. *Id.* at 1011, 102 S.Ct. 2777. The Court rejected the plaintiffs' contention and went on to state:

> Even if respondents' characterization of the State's duties were correct, however, it would not follow that decisions made in the day-to-day administration of a nursing home are the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public. Indeed, respondents make no such claim, nor could they.

*Id.* at 1011–1012, 102 S.Ct. 2777. Thus, the *Blum* Court held that the plaintiffs failed to demonstrate under the public function test that the defendants were state actors.

In this case, Plaintiffs focus on the overall duties pertaining to the non-combat Air Force missions CAP performs as a civilian auxiliary of the Air Force, specifically, CAP's duties pertaining to air searches, rescue operations and drug interdiction. (Doc. No. 38 at 8.) However, even assuming, without deciding that these specific functions are exclusively public functions, the court's analysis cannot begin and end with a determination of whether CAP's non-combat Air Force missions are "traditionally the exclusive prerogative of the [federal government]." *Jackson*, 419 U.S. at 353, 95 S.Ct. 449. Rather, under *Blum* a further inquiry must be made as to whether the conduct at issue in this litigation relates to CAP's performance of a public function.

The alleged unconstitutional conduct in this case does not arise from or pertain to CAP's non-combat Air Force missions. Rather, the specific acts concern personnel matters in the supervision, discipline and firing of CAP's employees. In other words, the "no-talk" directive and the firing of Plaintiffs did not arise in the context of Plaintiffs' performance of a non-combat Air Force mission but, instead, occurred in relation to CAP's response to lawsuits filed against CAP by former employees. Thus, the inquiry becomes whether decisions concerning these personnel matters are

traditionally and exclusively performed by the federal government. Plaintiffs have not made such an argument and, in light of *Blum*, could not do so in good faith. Applying *Blum*, the court finds that the type of internal administrative/personnel decisions at issue in this case are exactly the type of decisions that do not satisfy the public function analysis. Accordingly, the court finds that Plaintiffs fail to meet the public function test.

■ Additionally, under the state compulsion test, the federal government must "coerce[ ] or encourage[ ]" the unconstitutional conduct at issue. *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522, 546, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987); *see also Powe v. Miles*, 407 F.2d 73, 81 (2d Cir. 1968) ("[T]he state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury."). Similarly, under the nexus/joint action, the Eleventh Circuit has recently ruled that "the symbiotic relationship between the public and private entities must involve the alleged unconstitutional violation." [10] *Patrick*, 201 F.3d at 1316.

In this case, Plaintiffs have not shown the requisite connection between the federal government and the offending activity. Under both the state compulsion and nexus/joint action tests, Plaintiffs fail to allege, much less provide any evidence, that the federal government was entangled in CAP's decision to issue the "no-talk" directive to CAP employees and to fire

Plaintiffs. The court bases its finding on the following three grounds.

First, there are no federal regulations concerning Air Force oversight of CAP personnel, nor have the parties pointed to any internal policies of the Air Force governing or influencing CAP in matters involving the hiring, firing or discipline of CAP's employees. *See Kohn*, 457 U.S. at 841–842, 102 S.Ct. 2764 (acknowledging that the private school was subject to extensive state regulation but holding that the regulations pertaining to personnel matters were minimal and, thus, could not transform a decision to discharge, made by private management, into state action); *see also Blum*, 457 U.S. at 1012, 102 S.Ct. 2777 (Finding no state action, "the critical factor is the absence of any allegation that the employment decision was itself based upon some rule of conduct or policy put forth by the State.") (White, J., concurring).

Second, the undisputed evidence reveals that the Air Force had no involvement in CAP's management and supervision of its personnel. Parkhurst himself attests that CAP's personnel decisions, including hiring and firing, "are decisions made solely by CAP leadership." (Parkhurst Decl. ¶ 2.) He has "no command authority over CAP Headquarters personnel." (*Id.*) For his part, Parkhurst attests that he had no participation in CAP's decisions to issue the "no talk" directive and to terminate Plaintiffs. (*Id.* ¶¶ 4–5.) In sum, Parkhurst's Declaration establishes that all personnel matters were made internally by

**10.** In *Patrick*, a public hospital authority entered into a management agreement with a private entity called Floyd Healthcare Management, Inc. ("FHM"). 201 F.3d at 1314. Under the agreement, among other things, FHM "contracted to supervise the hiring and firing of hospital employees, maintain the hospital, enforce rules and regulations for safety considerations, and operate the hospital on a daily basis." *Id.* The plaintiff, a physician, applied for medical staff membership but FHM denied his application. *Id.* at 1314–15. The plaintiff brought a § 1983 action against FHM and the public hospital, among others. The plaintiff argued that, under the nexus/joint action test, FHM and the public hospital were "intertwined in a symbiotic relationship" based on the financial benefits and services the public hospital received from FHM. *Id.* at 1315–16. The Court rejected the plaintiff's arguments and held: "[U]nder the nexus/joint action test, the symbiotic relationship between the public and private entities must involve the alleged unconstitutional violation." *Id.* at 1316. "There is no evidence ... that [the public hospital] had anything to do with FHM's decision to deny [the plaintiff's] application." *Id.*

CAP management alone and not by any federal authority.

Third, Plaintiffs have not pointed to anything in the record indicating that the Air Force was responsible for CAP's decisions. Nor have they submitted any evidence refuting Parkhurst's averments. Instead, Plaintiffs assert that Parkhurst's Declaration "raises genuine issues of material fact" as to whether Parkhurst's knowledge about Albano's "no-talk" order and his failure to disagree with the appropriateness of the order demonstrates federal action.[11] (Doc. No. 38 at 2, 11.) The court disagrees.

Parkhurst was not aware of the "no-talk" directive until after the event. It would be impossible for Parkhurst to have had any influence over or participation in CAP's decisions of which he had no knowledge until after the fact. Moreover, the court finds that Parkhurst's statement that, if faced with the same situation, the Air Force would probably issue the same "no-talk" directive equates, at the most, approval of or acquiescence in CAP's action. However, as explained by the Supreme Court in *Blum*, "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives." *Blum*, 457 U.S. at 1004, 102 S.Ct. 2777; *see also Carlin Communications, Inc.*, 802 F.2d at 1357 (noting that, while the Supreme Court has employed "a number of different 'tests' for state action," it "has indicated that the import of its holdings is that mere approval of, or acquiescence in, the initiatives of a private party is not sufficient to establish state action").

Finally, in closing, the court addresses two additional arguments proffered by Plaintiffs with which the court disagrees. First, Plaintiffs argue that, under the joint/nexus action test, Plaintiffs need not establish a connection between the indicia of federal action and the specific acts comprising the alleged constitutional violation. (Doc. No. 38 at 13.) Specifically, Plaintiffs state that,

> while the defendants would have the Court believe that Plaintiffs must show some government coercion of the challenged action itself, that is not true where a symbiotic relationship has been established. In such cases, the plaintiff does not have the burden of demonstrating that the government's role in the challenged action, because "the government is charged with all actions of the private party [with whom the relationship exists]."

(Doc. No. 38 at 13 (quoting *Gerena v. Puerto Rico Legal Servs.*, 697 F.2d 447, 451 (1st Cir.1983)).) Plaintiffs' argument, however, which relies on a First Circuit decision, is foreclosed by the Eleventh Circuit's holding in *Patrick*. As held in *Patrick*, "the symbiotic relationship between the public and private entities must involve the alleged unconstitutional violation." 201 F.3d at 1316.

Second, Plaintiffs place great weight on *Grant v. Civil Air Patrol*, 1995 WL 150351 (D.N.H.1995), which is the only decision the court has found which addressed whether CAP is a federal actor for purposes of *Bivens*. (Doc. No. 38 at 14.) In *Grant*, the court found that "CAP and the Air Force are sufficiently interdependent to qualify CAP as a governmental actor under the symbiotic relationship test." *Id.* at *7. The court in *Grant*, however, reached its decision by relying on *Gerena*, *supra*. The holding in *Patrick*, however, is the law of this circuit, not *Gerena*. Accordingly, the court finds unpersuasive Plaintiffs' reliance on *Grant*.

---

11. Plaintiffs point to ¶ 4 of Parkhurst's Declaration wherein he states, in part, as follows: "As the Issacson [sic] and Swanson cases were progressing toward trial, I attended a CAP Headquarters staff meeting. During this meeting, I heard that CAP management had instructed CAP employees not to discuss the pending litigation ...." (Parkhurst Decl. ¶ 4.) He continues, "[s]ome time well after the 'no-talk' directive had been given, I mentioned to the CAP Director, Paul J. Albano, Sr., that this approached seemed consistent with what I believed the course the Air Force would take to pending litigation." (*Id.*)

In sum, the court finds that CAP's decisions to issue the "no-talk" directive and to discharge Plaintiffs were not compelled or influenced by any federal actor or regulation. Accordingly, the court finds that Plaintiffs have failed to demonstrate federal action, a necessary element to a *Bivens* action. Accordingly, the court finds that summary judgment is due to be granted in favor of CAP and the Air Force Defendants on Counts 1–6.[12]

B. *42 U.S.C. § 1985(3) (Counts 7–8)*

█ Each Plaintiff sets forth a conspiracy claim, Campbell in Count 7 and Shaw in Count 8. Plaintiffs' claims are identical. Plaintiffs allege that, in violation of 42 U.S.C. § 1985(3), Albano, Brooks and Brown, as employees of CAP, conspired with Parkhurst, an officer of the United States Air Force, to deprive Plaintiffs of their "fundamental rights to free expression and [their] rights to equal protection of the law, equal privileges and immunities under the laws, and substantive and procedural due process." (2nd Am.Compl.¶¶ 91, 97.)

To establish a claim for a § 1985(3) conspiracy, a plaintiff must prove: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Park v. City of Atlanta,* 120 F.3d 1157, 1161 (11th Cir.1997).

The Air Force Defendants and the CAP Defendants set forth several arguments which they contend warrant the entry of summary judgment in their favor. Their arguments are the same, and, thus, the court will address them together.

First, the CAP and Air Force Defendants point out that, for the first time in Plaintiffs' Second Amended Complaint, Plaintiffs have added Parkhurst as a member of the § 1985(3) conspiracy. They argue that Parkhurst's addition to the § 1985(3) conspiracy is gratuitous only and that Plaintiffs added Parkhurst in an attempt to circumvent the intracorporate conspiracy doctrine, discussed *infra.* According to the Air Force and CAP Defendants, Plaintiffs have not set forth any facts demonstrating that, under the first element, Parkhurst had an agreement with any of the alleged CAP co-conspirators. (Doc. No. 35 at 19.) The court agrees.

Under the first § 1985(3) element, a plaintiff must show "an agreement between the members of the alleged conspiracy." *Godby v. Montgomery County Bd. of Educ.,* 996 F.Supp. 1390, 1412 (M.D.Ala. 1998). As explained in *Godby,* "[a]lthough the existence of a conspiracy may be supported by circumstantial evidence, there must be some indication that the individuals were acting, in some sense, in concert." *Id.* "Where there is no indication of an agreement to act against the constitutional rights of an individual there is no cause of action under § 1985." *Id.*

Here, the CAP and Air Force Defendants have submitted the Declaration of Parkhurst in support of their respective Motions For Partial Summary Judgment. As discussed in the previous section, Parkhurst discusses his involvement (or, rather, lack thereof) in the decisions regarding CAP's "no talk" directive and the terminations of Campbell and Shaw. These decisions also form the basis of Plaintiffs' conspiracy claims.

The court finds that Parkhurst's Declaration establishes that there was no agreement between Parkhurst and any of the alleged CAP co-conspirators. Parkhurst knew nothing about the "no-talk" directive or the terminations of Plaintiffs until after the events took place. (Parkhurst Decl. ¶¶ 4–5.) Parkhurst cannot be said to have a meeting of the minds with Albino or any

---

**12.** Because the court finds no governmental action, the court need not address the merits of Plaintiffs' constitutional claims in Counts

1–6. *See San Francisco Arts & Athletics, Inc.,* 483 U.S. at 543 n. 22, 107 S.Ct. 2971.

other alleged co-conspirator if the actions were planned and carried out without Parkhurst's involvement or knowledge.

Plaintiffs' only evidence regarding Parkhurst's alleged involvement in the decisions at issue is contained in an Affidavit from Isaacson in which Isaacson states that Parkhurst "is personally involved in all staff meetings" and "is a frequent attendant at all Directors' meeting." (Doc. No. 38 at 25 & Ex. 14.) Parkhurst's attendance at staff meetings and directors meetings, however, does not equate knowledge or involvement as to the specific actions at issue. Attendance does not indicate or even suggest that Parkhurst contacted, influenced or talked to Albano concerning the "no-talk" directive or firing decisions. *See Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348 (To survive summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts.").

Moreover, there is no evidence that *prior to* Albano issuing the "no-talk" directive and *prior to* Plaintiffs' terminations, these decisions were discussed at either a staff meeting or at a directors' meeting. Assuming nonetheless that such decisions were debated at these meetings, there is no evidence that Parkhurst took part in such discussions or had any type of agreement with Albano concerning the decisions at issue. "A conspiracy cannot be shown merely by showing that [a defendant] played a part" in the challenged decisions. *Godby*, 996 F.Supp. at 1412. "Rather, an agreement must be shown." *Id.* Furthermore, assuming for the sake of argument that Parkhurst had knowledge of the "no talk" directive and the firing decisions, such knowledge or even acquiescence is not tantamount to an agreement. *See Player v. State of Alabama Dep't of Pensions and Sec.*, 400 F.Supp. 249, 262 (M.D.Ala.1975), *aff'd*, 536 F.2d 1385 (5th Cir.1976) ("Proof of acquiescence alone does not establish the intent necessary for liability under Section 1985(3).").

In sum, the court finds that Plaintiffs' arguments pertaining to Parkhurst's involvement in a conspiracy are speculative, at best, and that Plaintiffs have failed to tie Parkhurst's actions (or non-actions) to some sort of an agreement. *See Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1198 (11th Cir.1997) ("Summary judgment cannot be avoided . . . based on hunches unsupported with significant probative evidence."); *see also Godby*, 996 F.Supp. at 1412 ("Supposition is not sufficient to withstand summary judgment."). Accordingly, the court finds that Parkhurst was not a member of the alleged § 1985(3) conspiracy. As a result, only Albano, Brown and Brooks remain as potential members of a § 1985(3) conspiracy.

■ Second, the CAP and Air Force Defendants argue that because the only remaining participants in the alleged § 1985(3) conspiracy are all CAP employees, they constitute a single entity incapable of forming an alleged conspiracy. (Doc. No. 35 at 19, 21.) In making this argument, they rely on the intracorporate conspiracy doctrine. The court agrees.

The intracorporate conspiracy doctrine is premised on the fact that to have a conspiracy a plaintiff must show an agreement between two or more persons and that agents of a single legal entity constitute only one person. *See Dickerson v. Alachua County Comm'n*, 200 F.3d 761, 767 (11th Cir.2000); *see also Park v. City of Atlanta*, 120 F.3d 1157, 1161 (11th Cir. 1997). As explained in *Dickerson*,

> a corporation's employees, acting as agents of the corporation, are deemed incapable of conspiring among themselves or with the corporation. . . . The reasoning behind the intracorporate conspiracy doctrine is that it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself, just as it is not possible for an individual person to conspire with himself.

200 F.3d at 767. "The intracorporate conspiracy doctrine applies to both private

corporations and public, government entities." *Id.*

Here, Plaintiffs allege a conspiracy by CAP employees to deprive them of their constitutional rights. Based on the holding in *Dickerson,* however, the court finds that the intracorporate conspiracy doctrine bars Plaintiffs' § 1985(3) claim. Specifically, under the intracorporate conspiracy doctrine, the court finds that Albano, Brooks and Brown, as agents and employees of CAP, constitute a "single legal entity" and, thus, are not "capable of conspiring" together. 200 F.3d at 767–68. Therefore, Plaintiffs cannot demonstrate that at least two people conspired together, as required to state a § 1985(3) claim.

Even if the court were not to grant summary judgment on the basis of the intracorporate conspiracy doctrine, there exists another ground for summary judgment. There is no evidence of any agreement between Albano, Brooks and Brown. Plaintiffs allege that Albano, Brooks and Brown instructed CAP employees not to discuss the Swanson and Isaacson cases, that Brown fired Campbell, and that Shaw was fired at Brooks, Brown and Albano's directive. (2nd Am.Compl.¶¶ 23, 24, 25, 29, 35, 36.) However, there is no evidence in the record to support these allegations. The only evidence is that Albano issued the "no-talk" directive (Parkhurst Decl. ¶ 4), not that Albano acted in concert with either Brooks or Brown. Thus, Plaintiffs are left only with the allegations in their Second Amended Complaint and that is not enough. *See* FED.R.CIV.P. 56(e). Accordingly, for the foregoing reasons, the court finds that summary judgment is due to be entered on Plaintiffs' § 1985(3) conspiracy claims.

### C. 42 U.S.C. § 1986 (Counts 9 and 10)

■ In Counts 9 and 10, Plaintiffs bring claims against all Defendants for violations of 42 U.S.C. § 1986. (2nd Am. Compl.¶¶ 103–108.) The CAP and Air Force Defendants argue that, "[b]ecause Plaintiffs fail[ ] to state valid § 1985 claims, their § 1986 claims similarly fail to state a claim." (Doc. No. 35 at 22.) The court agrees.

Section 1986 is, in effect, a "derivative of § 1985." *Park,* 120 F.3d at 1160. Section 1986

> provides a cause of action against anyone who has knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses to do so.

*Id.* at 1159. A violation of § 1986 cannot be established unless there is a violation of § 1985. *Id.* at 1160. Because the court has found that Plaintiffs cannot sustain their § 1985 claims, it inevitably follows that Plaintiffs cannot establish violations of § 1986. Thus, the court finds that summary judgment is due to be granted on Plaintiffs' § 1986 claims.

### D. State Law Conspiracy (Counts 11–12)

Plaintiffs also allege conspiracy under state law in Counts 11–12. Plaintiffs bring their conspiracy claims against Albano, Brown, Brooks and Parkhurst, each alleging that these Defendants "combined and confederated together to injure [him] in his person and property by committing a tortious act against him and others." (2nd Am.Compl.¶¶ 109, 114.)

The Supreme Court of Alabama has indicated that "[t]he essence of a conspiracy is an agreement, a meeting of the minds between the conspirators." *First Bank of Childersburg v. Florey,* 676 So.2d 324, 327 (1996). "Although civil liability for conspiracy may be established by circumstantial evidence, the evidence of the agreement [between coconspirators] must be sufficient to create more than suspicion or conjecture in order to justify submission to the jury." *Id.* at 328. As previously discussed in regard to Plaintiffs' § 1985 claims, Plaintiffs' evidence of an agreement is based purely upon supposition and unsupported allegations. Thus, the court

**1318**

finds that Plaintiffs have failed to produce sufficient direct or circumstantial evidence of an agreement. Accordingly, the court finds that summary judgment is appropriate as to Plaintiffs' state law claims of conspiracy.

### V. ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that the CAP Defendants' Renewed Motion To Dismiss Or, In The Alternative, Motion For Partial Summary Judgment (Doc. No. 35), filed July 1, 1999, which the court has construed as a Motion For Partial Summary Judgment, be and the same is hereby GRANTED.

It is further CONSIDERED and ORDERED that the Air Force Defendants' Renewed Motion To Dismiss Or, In The Alternative, Motion For Partial Summary Judgment (Doc. No. 36), filed July 1, 1999, which the court has construed as a Motion For Partial Summary Judgment, be and the same is hereby GRANTED.

Accordingly, Counts 1–12 of Plaintiffs' Second Amended Complaint be and the same are hereby DISMISSED.