Anthony NAZZARO and Mary Nazzaro, his wife, Plaintiffs,

v.

The UNITED STATES of America, DE-PARTMENT OF THE ARMY; Department of the Air Force; United States Air Force Auxiliary Civil Air Patrol and ABC Corp., or John Doe, Defendants.

Civil Action No. 02–1735 (JEI).

United States District Court, D. New Jersey.

Jan. 28, 2004.

Lentz & Gengaro by Mitchell L. Goldstein, Esq., West Orange, NJ, for Plaintiffs.

Smith, Stratton, Wise, Heher & Brennan, L.L.P. by Brian P. Sullivan, Esq., Wendy L. Mager, Esq., Princeton, NJ, for Defendant Civil Air Patrol.

Christopher J. Christie, United States Attorney by Dorothy Donnelly, Esq., Trenton, NJ, for Defendants United States of America, Department of the Army and Department of the Air Force.

## OPINION

IRENAS, Senior District Judge.

This case comes before the Court on Defendant Civil Air Patrol's ("CAP") motion for summary judgment pursuant to Fed.R.Civ.P. 56(c) and Defendants United States of America, Department of the Army and Department of the Air Force's ("United States," "Army" and "Air Force," respectively)[1] motion for summary judgment and motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1). This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346(b)(1) and 1367.[2]

**I.**

At the time of the events giving rise to this suit, Plaintiff Anthony Nazzaro ("Nazzaro") was a senior member in the Picatinny Composite Squadron, New Jersey Wing, of the Civil Air Patrol ("CAP"). Plaintiff Mary Nazzaro is his wife. On May 6, 2000, Nazzaro participated in a recreational outing arranged by the CAP for its members at the Fort Dix, New Jersey army base.

Fort Dix permitted CAP to use the base confidence course pursuant to a licensing agreement.[3] The confidence course is located in a wooded area on the base and contains various barriers and obstacles designed to train and test balance, instill confidence, encourage daring and promote physical conditioning. Donnelly Decl. Ex. 9. Nazzaro voluntarily participated in the outing and was injured when he fell ap-

---

1. Plaintiffs' Complaint is not a model of clarity with regard to the named defendants. Plaintiffs' original caption lists the defendants as "The United States of American, [*sic*] Department of the Army; Department of the Air Force; United States Air Force Auxiliary Civil Air Patrol, and ABC Corp or John Doe." Both the inconsistent use of commas and semicolons and the substance of the Complaint itself make it unclear if Plaintiff is suing the United States, the Air Force and the Army as three separate entities or if Plaintiff is merely suing the United States Air Force and the United States Army as two separate entities. Papers submitted to the Court after the initial complaint, however, indicate that the parties view the Complaint as having named the United States as a separate defendant. *See, e.g.,* U.S. Def.'s Answer (captioned as "Nazzaro v. U.S.A., et al."); U.S. Def.'s Notice of Mot. (stating that "the undersigned attorneys for the defendants United States and the named federal agencies" were giving notice). Therefore, the Court will treat the Complaint as having named the United States, the Department of the Army and the Department of the Air Force as three separate defendants.

2. Plaintiffs' Complaint incorrectly asserted that this Court's jurisdiction arose under 28 U.S.C. §§ 1331 and 1339. Section 1339 gives the district courts jurisdiction over "any civil action arising under any Act of Congress relating to the postal service" and is completely irrelevant in the instant matter. Plaintiff also failed to indicate that this Court's ability to hear Plaintiff's claims against CAP is based on supplemental jurisdiction pursuant to 28 U.S.C. § 1367 (2003).

3. Army Regulation 405-80 "sets forth the authority and prescribes policies for the management of United States of America title to real property under the jurisdiction or control of the Department of the Army." Donnelly Decl. Ex. 12. Section 2–13b(3) of the Regulation permits installation commanders to grant revocable licenses of land, facilities, or space to a variety of organizations including civil, community and non-profit entities. *Id.*

Pursuant to the regulation, the Fort Dix Installation Commander's authorized representative, Jean M. Johnson, signed a "Community Relations Commanders License to use Facilities at Fort Dix, New Jersey" (Lic.# 0–062–46) (the "License") which permitted the CAP to use certain Fort Dix facilities from April 1, 2000 through March 31, 2001. *Id.* Ex. 5. Bruce A. Berner signed the License on behalf of the CAP.

proximately thirty (30) feet from an obstacle on the course.[4]

On or about May 22, 2001, Nazzaro submitted a personal injury claim for five (5) million dollars to the United States Government. Donnelly Decl. Ex. 1. Nazzaro claimed that, as a result of his fall, he suffered "serious injuries involving a fracture, spinal burst fracture at the A1 spinal level, requiring multiple surgeries and insertion of rods" among other injuries. *Id.* Nazzaro's claim did not mention his wife nor did Mary Nazzaro submit a separate claim. *Id.* The Department of the Air Force denied Nazzaro's claim in a letter dated November 6, 2001. *Id.*[5]

On April 12, 2002, Plaintiffs filed a three-count Complaint with this Court. Count One, brought by Nazzaro, alleges negligence on the part of the United States, and the Departments of the Army and Air Force ("United States," "Army" and "Air Force," respectively). Count Two, brought by Nazzaro, alleges negligence on the part of CAP. Count Three, brought by Mary Nazzaro, alleges negligence and loss of society, services and consortium against all Defendants. On October 1, 2003, CAP filed a motion for summary judgment, pursuant to Fed. R.Civ.P. 56(c) asserting immunity from suit under New Jersey's Charitable Immunity Act ("NJCIA"), N.J. Stat. Ann. § 2A:53A–7 *et seq.* (West 2003). On the same day, the United States, the Army and the Air Force filed a motion for summary judgment as to Counts One and Two and a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(1) as to Count Three. The United States and its agencies assert that their motion for summary judgment is appropriate on three separate grounds: (1) sovereign immunity; (2) immunity under New Jersey state law; and (3) failure to breach any duty owed to Plaintiffs. The motion to dismiss is predicated on Mary Nazzaro's failure to file notice of a tort claim. The Court heard oral arguments on all motions on December 30, 2003.

For the sake of clarity, the Court will first discuss CAP's motion for summary judgment, then the United States, Army and Air Force's motion for summary judgment, and, finally, the motion to dismiss.

## II.

Summary judgment is appropriate where " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d

---

**4.** The obstacle is known as "the tough one" and requires a participant to climb a rope or pole on one side of the structure, to navigate a log walkway at the top of the rope, to climb a ladder at the end of the walkway, and, finally, to descend a cargo net to the ground. Donnelly Decl. Ex. 9 at 14.

Instructional materials for the course recommend the approach described above as the means to navigate the obstacle. *Id.* Those materials, however, also note that persons attempting the course "need not conform to any one method of negotiating the obsta-

cles...." *Id.* at 4. Nazarro attempted to negotiate the tough one by climbing the cargo net first.

**5.** The letter, written by John F. McCune, Major, USAF, indicated that the letter constituted "the final denial of the claim of Anthony Nazzaro. If he is dissatisfied with this decision, he may now file suit in an appropriate United States District Court not later than six months after the date of mailing of this letter." Donnelly Decl. Ex. 1.

Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A.

Defendant Civil Air Patrol's ("CAP") motion for summary judgment is based on its position that it is immune from suit under New Jersey's Charitable Immunity Act ("NJCIA"), N.J. Stat. Ann. 2A:53A–7 *et seq.* (West 2003). The NJCIA, enacted after judicial and legislative disagreement over the validity of the doctrine of charita-

ble immunity,[6] bars tort claims against certain religious, educational or charitable organizations.

New Jersey initially adopted the doctrine of charitable immunity in *D'Amato v. Orange Memorial Hospital*, 101 N.J.L. 61, 127 A. 340 (1925) (barring a negligence suit against a corporation established to maintain a public charitable hospital). In 1958, however, the New Jersey Supreme Court abolished the doctrine, finding that it "had no sound English common law antecedents and [had] found its way into American law by misconception." *Collopy v. Newark Eye & Ear Infirmary*, 27 N.J. 29, 141 A.2d 276, 287 (1958); *see also*

---

**6.** The conflict in New Jersey parallels that experienced throughout the United States. Charitable immunity was first recognized in English case law in 1846. *See Feoffes of Heriot's Hospital v. Ross*, 8 Eng. Rep. 1508 (H.L.1846) (finding that a person harmed from the wrongdoing of a charitable organization's trustee had no right to recover damages from the trust fund). Twenty years later, however, the House of Lords rejected charitable immunity in its decision, *Mersey Docks & Harbour Board of Trustees v. Gibbs*, 111 Eng. Rep. 1500 (1866) (finding that injured individuals may recover damages from a trust fund stating that, as a matter of justice, "the trust or corporate property should be amenable to the individual injured"). English repudiation, however, did not prevent American courts from adopting the immunity. *See* 1 Dan B. Dobbs, *The Law of Torts* 761 (2001) (tracing the history of charitable immunity in England and the United States); *see also* 2 Stuart M. Speiser, *The American Law of Torts* § 6:42 (2003)(describing the adoption of charitable immunity in the United States as a "comedy of errors").

Nearly ten years after England rejected charitable immunity, Massachusetts recognized the doctrine for the first time in the United States in *McDonald v. Massachusetts General Hospital*, 120 Mass. 432 (1876) (denying plaintiff recovery of damages from a public charitable hospital's trust fund). Other states, including New Jersey, followed. Although the basic tenets of the doctrine appear to have been widely adopted in the wake of *McDonald, see* 2 Speiser, *supra* § 6:42 (stating

that the "doctrine of charitable immunity spread like wildfire across the American judicial scene-except for a few hardy scattered jurisdictions" such as Rhode Island and Minnesota), at least one jurist has noted that "[i]t is doubtful that the so-called 'rule' of full immunity ever represented the prevailing state of decision in this country. Conflict has existed from the beginning." *President & Dir. of Georgetown Coll. v. Hughes*, 130 F.2d 810, 817 (D.C.Cir.1942) (discussing the adoption of the doctrine in the United States and ultimately rejecting it).

In the mid–20th century, however, the United States Court of Appeals for the District of Columbia's decision in *President and Directors of Georgetown College v. Hughes*, 130 F.2d 810 (D.C.Cir.1942), triggered a trend towards abolishing the doctrine entirely. *See* 1 Dobbs, *supra* at 762 n. 18 (describing the decision as "the classic criticism, which more or less turned immunity thinking around"); 2 Speiser, *supra* § 6:42 (noting that the *Hughes* decision "turned the law around" and "has since been followed by a wave of decisions in other jurisdictions"). Today, the majority of courts and state legislatures have rejected the immunity and those states that retain it "limit its effect by defining charities with increasing rigor and by removing the immunity to the extent that insurance protects the charity." 1 Dobbs, *supra* at 763–64; *see also* 2 Speiser, *supra* § 6:42 (noting that the doctrine "still survives in some few jurisdictions, largely by virtue of statute").

*Benton v. Y.M.C.A.,* 27 N.J. 67, 141 A.2d 298 (1958); *Dalton v. St. Luke's Catholic Church,* 27 N.J. 22, 141 A.2d 273 (1958). The *Collopy* court further noted that charitable immunity "runs counter to widespread principles which fairly impose liability on those who wrongfully and negligently injure others." *Collopy,* 141 A.2d at 287.

■ Immediately after the New Jersey Supreme Court repudiated the doctrine, however, the New Jersey Legislature introduced and passed bills to reinstate it. *Parker,* 579 A.2d at 363 (discussing the history of charitable immunity in New Jersey). The enactment of NJCIA reaffirmed an immunity designed to preserve charitable trust funds, to encourage private philanthropic activity in order to assure the continued provision of services that benefit the general welfare, and to relieve the government of the burden of providing those services. *Ryan v. Holy Trinity Evangelical Lutheran Church,* 175 N.J. 333, 815 A.2d 419, 425–26 (2003) (gathering cases discussing the underlying purpose of the NJCIA) (internal citations omitted).

■ The current statute provides that: No nonprofit corporation . . . organized exclusively for religious, charitable or educational purposes or its . . . employees, agents, servants or volunteers shall, except as hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, . . . where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, . . . provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation . . . or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation . . . .

N.J. Stat. Ann. § 2A:53A–7(a). Thus, the NJCIA provides immunity from tort liability where the entity being sued: (1) is a non-profit corporation; (2) is organized exclusively for religious, charitable or educational purposes; and (3) was advancing those purposes "at the time of the injury to plaintiff who was then a beneficiary of the charitable works." *Bieker v. Cmty. House of Moorestown,* 169 N.J. 167, 777 A.2d 37, 42 (2001). The law is "deemed to be remedial and shall be liberally construed." N.J. Stat. Ann. § 2A:53A–10.

Plaintiffs do not challenge that CAP is a non-profit corporation, nor that Plaintiffs are beneficiaries as defined under the statute. Rather, Plaintiffs argue that CAP is not organized solely for charitable or educational purposes. Therefore, the Court will focus on the second element of the test. Where, as here, "there is no dispute as to the material facts, the determination of whether a non-profit corporation, society or association is organized for religious, charitable, educational or hospital purposes is a question of law for the court to decide." *Pelaez v. Rugby Lab., Inc.,* 264 N.J.Super. 450, 624 A.2d 1053, 1055 (1993).

A determination of whether an entity is organized solely for charitable, religious or educational purposes is made on a case-by-case basis and requires a fact-sensitive inquiry which looks "beyond [an entity's] benevolent acts." *Ryan,* 815 A.2d at 425; *see also Presbyterian Homes v. Div. of Tax Appeals,* 55 N.J. 275, 261 A.2d 143, 148 (1970) (noting that the "term 'charity' in a legal sense is a matter of description rather than a precise definition"). Courts have found the analysis simpler where an organization serves solely educational or religious purposes, because "the terms 'educational' and 'religious' have plain meanings that are subject to literal reading." *Abdallah v. Occupational Ctr. of Hudson*

*County, Inc.,* 351 N.J.Super. 280, 798 A.2d 131, 133 (2002). Where an organization claims a "charitable" purpose, however, "[w]hat is required is an examination of the entity seeking to clothe itself in the veil of charitable immunity to discover its aims, its origins, and its method of operation in order to determine whether its dominant motive is charity or some other form of enterprise." *Parker v. St. Stephen's Urban Dev. Corp., Inc.,* 243 N.J.Super. 317, 579 A.2d 360, 364 (1990).

Courts conducting this inquiry have looked to an organization's funding, charter, daily operations, relationships to other entities, and the extent to which an organization lessens a burden on the government. *See, e.g., Bieker,* 777 A.2d at 44–45 (applying charitable immunity to a non-profit corporation who rented its gymnasium for private weddings, parties, recitals, classes and sports because those events "meet important social and recreational needs of the community"); *Parker,* 579 A.2d at 364–65 (denying charitable immunity to a community housing corporation created solely to act as a conduit for government funding and not to lessen a government burden or to achieve any charitable purpose); *Bixenman v. Christ Episcopal Church Parish House,* 166 N.J.Super. 148, 399 A.2d 312, 314 (1979) (finding that a church did not lose its charitable immunity by leasing the church premises for a nominal fee to a church of a different denomination); *Beicht v. Am. Polish Veterans,* 259 N.J.Super. 79, 611 A.2d 168, 169 (1992)(denying charitable immunity to a fraternal organization because "[f]raternal societies or those organizations whose purpose is to promote the welfare of their members are benevolent but not charitable"); *Kirby v. Columbian Inst.,* 101 N.J.Super. 205, 243 A.2d 853, 855 (1968)(denying charitable immunity to a fraternal organization whose aims included the purchase of lands upon which the organization was to "erect thereon a clubhouse or other buildings"); *Gould v. Theresa Grotta Ctr.,* 83 N.J.Super. 169, 199 A.2d 74, 75 (1964) (deeming charitable a nursing home whose financial support came from a combination of insurance payments, patient's fees, donations and government support).

Where the government provides funding to an organization and/or is involved on some level in the organization's decision making, New Jersey courts engage in this same fact-sensitive inquiry. The courts have denied immunity where an organization serves "purely as a conduit for federal funds," *Parker,* 579 A.2d at 366, but have explicitly noted that " 'the fact that a [non-profit corporation] happens to receive some government support would not alter its nature as a charity for immunity purposes' if it performs charitable services and is 'essentially supported through charitable contributions.' " *Morales v. New Jersey Academy of Aquatic Sciences,* 302 N.J.Super. 50, 694 A.2d 600, 602–03 (1997) (finding that state support of an aquarium in the form of a yearly lease of the physical facility for one (1) dollar, state representation on the Board of Trustees and significant state control over operations and decisions did not alter the aquarium's status as a charitable organization where the aquarium retained basic control over operations and received "a substantial amount of charitable contributions"); *see also Pelaez,* 624 A.2d at 1057 (granting charitable immunity to a drug rehabilitation center even though the center received over eighty (80) percent of its funding from government grants, finding that the center actively solicited private funds which "lessen[ed] the government burden of providing such funding").

Although courts have explored the scope of charitable immunity in other contexts, this is the first time any court has been

asked to determine if the CAP is a charitable organization under the NJCIA.[7] Thus, for the first time, this Court must examine CAP's origin, structure, goals, aims and funding to determine if it qualifies as a charitable organization entitled to immunity under the NJCIA.

### 1.

The Civil Air Patrol, originally organized in 1941 and incorporated on July 1, 1946, is a private federally chartered corporation.[8] 36 U.S.C. § 40301 (2003); *see also Campbell v. Civil Air Patrol*, 131 F.Supp.2d 1303, 1308 (M.D.Ala.2001). CAP is governed by an eleven (11) member Board of Governors, four of whom are appointed by the Secretary of the Air Force, four more of whom must be members of CAP and three of whom are to be persons with an "interest and expertise in civil aviation and the Civil Air Patrol mission" appointed jointly by the Secretary of the Air Force and the National Commander of the CAP. 10 U.S.C. § 9447(b),(c) (2003); *see also* 36 U.S.C. § 40303; *Rogers v. Civil Air Patrol*, 129 F.Supp.2d 1334, 1336 (M.D.Ala. 2001).

CAP's purposes are to:

(1) (A) encourage and aid citizens of the United States in contributing their efforts, services, and resources in developing aviation and in maintaining air supremacy; and

(B) encourage and develop by example the voluntary contribution of private citizens to the public welfare.

(2) To provide aviation education and training especially to its senior and cadet members.

(3) To encourage and foster civil aviation in local communities.

(4) To provide an organization of private citizens with adequate facilities to assist in meeting local and national emergencies.

(5) To assist the Department of the Air Force in fulfilling its noncombat programs and missions.

36 U.S.C. § 40302.

To further these goals, CAP provides numerous services, including: ground search and rescue support to local, state and federal government departments and agencies; aerospace education and training for members; aerospace educational opportunities and course materials to schoolteachers and students; emergency medical training and support; aerial reconnaissance for homeland security and drug enforcement efforts; and anti-drug educational programs for school-age children. Allenback Certification ¶ 5.[9]

---

7. In fact, this Court's research indicates that only the United States District Court for the Eastern District of Wisconsin has previously addressed whether a state's doctrine of charitable immunity applies to the CAP. *See Hooten v. Civil Air Patrol*, 161 F.Supp. 478 (E.D.Wis. 1958) (finding the CAP a charitable organization under Wisconsin's charitable immunity statute and, therefore, not liable "under the doctrine of respondeat superior for the negligence of [its] servants"). Three years after *Hooten*, however, the Wisconsin Supreme Court abolished the doctrine of charitable immunity in that state. *See Kojis v. Doctors Hosp.*, 12 Wis.2d 367, 107 N.W.2d 131 (1961).

8. As a federally chartered corporation, CAP may:

(1) adopt and amend a constitution, bylaws and regulations;

(2) adopt and alter a corporate seal;

(3) establish and maintain offices in the District of Columbia and the States, territories, and possessions of the United States to conduct its affairs;

(4) acquire, own, lease, encumber, and transfer property as necessary to carry out the purposes of the corporation;

(5) sue and be sued; and

(6) do any other act necessary and proper to carry out the purposes of the corporation. 36 U.S.C. § 40304 (2003).

9. In addition, CAP's July 2003 Fact Sheet indicates that CAP supports college workshops and national conferences, funds college scholarships, maintains a website with edu-

In addition to its own equipment, supplies and personnel,[10] CAP's charter permits it to "use equipment, supplies, and other resources, including aircraft, motor vehicles, computers, and communications equipment provided" by the federal government in order "to provide assistance requested by State or local governmental authorities to perform disaster relief missions and activities, other emergency missions and activities, and nonemergency missions and activities" and "to fulfill its other purposes set forth in section 40302 of title 36." 10 U.S.C. § 9443(a).

CAP also acts as a volunteer civilian auxiliary of the United States Air Force "when the services of the Civil Air Patrol are used by" a federal agency or department. 10 U.S.C. § 9442 (2003). As an Air Force auxiliary, CAP carries out "noncombat programs and missions of the Department of the Air Force" at the request of the Secretary of the Air Force. 10 U.S.C. § 9442(b); *see also Campbell*, 131 F.Supp.2d at 1308–09.[11] When CAP is engaged in carrying out these noncombat missions, the Air Force is permitted to provide CAP with a wide array of support including equipment, supplies, training aids, personnel, funds and use of services and facilities. 10 U.S.C. § 9444. The Secretary of the Air Force prescribes regulations for the provision of that support as well as regulations "governing the conduct of the activities of the Civil Air Patrol when it is performing its duties as a volunteer civilian auxiliary" under § 9442. 10 U.S.C. § 9448(b). In all other circumstances, however, CAP activities "are considered corporate missions, over which the Air Force exercises no control." *Campbell*, 131 F.Supp.2d at 1309.

CAP funding comes from a variety of sources including charitable donations, fund raising, membership dues, and government funding from federal, state and local levels. Allenback Certification ¶ 6; *see also* Goldstein Certification, Ex. H. Between October 1, 1999 and September 30, 2000, CAP had a total revenue of $14,466,414.00. Goldstein Certification, Ex. H. Approximately $4,390,000 of that funding came from the government.[12] *Id.* Government funding pays the salaries of national headquarter employees and reimburses the CAP for the costs of rescue work and Air Force missions. *Id.* Government reimbursements, however, are limited to "the actual costs of operation of the aircraft to include fuel, oil and minor maintenance," and exclude major maintenance and depreciation. *Id.* ¶ 4. The government also does not reimburse CAP for volunteer time. *Id.* Outside of these reimbursements, the government does not pay the

cational resources, provides disaster relief support, and helps "transport time-sensitive medical materials, blood products and body tissues." July 2003 Fact Sheet, *at* http://www.cap.gov.

10. CAP information materials state that CAP has over 64,000 members, maintains a corporate fleet of 550 aircraft and 1,000 emergency vehicles, has approximately 675 chaplains and has a corporate staff of over 260 persons. *See* July 2003 Fact Sheet, *at* http://www.cap.gov.

11. Non-combat missions are "mission[s] for which the Air Force is tasked, by statute, regulation, or higher authority, which does not involve actual combat, combat operations, or combat training" and "include[s] search and rescue training and operational missions, disaster relief training and operational missions, support of the military during national emergencies, and CAP cadet orientation flights." *Campbell*, 131 F.Supp.2d at 1309 (internal citation omitted).

12. CAP's 1999 IRS Tax Return indicates that CAP received $3,609,837.00 in government contributions and $785,242.00 in government contracts. Goldstein Certification, Ex. H.

CAP for its services in noncombat missions. *Id.*

## 2.

The goal of this Court's examination of CAP's purposes, aims, structure and funding, is to determine whether CAP's "dominant motive is charity or some other form of enterprise." *Parker,* 579 A.2d at 364. With this framework in mind, and in light of the liberal construction required under the NJCIA, the Court finds that CAP is a charitable organization under New Jersey's charitable immunity statute.

First, the language of CAP's charter makes it clear that CAP's goals are charitable in nature. CAP was organized to encourage volunteer efforts to improve the public welfare, to provide aviation education and training, and to assist in national emergencies. These aims provide a broad benefit to the public and are squarely in line with one of the core purposes of the NJCIA, namely, to encourage private efforts designed to alleviate burdens the government would otherwise be forced to bear. *Ryan,* 815 A.2d at 424 (noting that charitable immunity serves to "assure the continued provision of beneficent services and to relieve the government of the burden of providing them"). CAP's additional goal of assisting the Air Force in noncombat missions, does not, as Plaintiff argues, prevent CAP from claiming to be a charitable organization. Rather, CAP's role as a civilian auxiliary shows that it actively and consistently relieves the government of burdens in areas such as disaster relief, search and rescue operations, and public outreach and education about aerospace and aviation issues.

■ Second, CAP's structure does not disqualify it from eligibility for charitable immunity. CAP is a federally chartered private corporation and an autonomous entity. Although a portion of CAP's Board of Governors is appointed by the Secretary of the Air Force, government representa-

tion on a board or involvement in decision making alone is insufficient to deprive an organization of its charitable status. *See Morales,* 694 A.2d at 602 (noting that "the acceptance of government funds and some measure of government control does not transform a private non-profit corporation into a governmental instrumentality" where the organization retains basic control over its operations). Certainly, the Air Force has some influence on the Board, provides general assistance and support to CAP and, in the context of a noncombat mission, regulates CAP's activities. However, there is no evidence that CAP's Board, or its operational or administrative decisions are dominated or controlled by the government. *See, e.g., Campbell,* 131 F.Supp.2d at 1309 (noting that although the Air Force provides funding and assistance to CAP, it has no role in CAP's personnel matters); *Pearl v. United States,* 230 F.2d 243, 245 (10th Cir.1956) (noting, that in its capacity as a private federally chartered corporation, federal control over CAP is "only such as is common to virtually all private corporations granted federal charters"). The Memorandum of Understanding between the United States Air Force and the Civil Air Patrol explicitly states that when CAP acts as an auxiliary of the Air Force, CAP agrees "to comply with Air Force Directives" but that CAP has the right "to involve itself in activities exclusive of Air Force interests" and that all other missions are "corporate missions, over which the Air Force exercises no control, and for which no federal benefits will apply." Donnelly Decl. Ex. 10. CAP's charter and its operations clearly indicate that it is a private corporation which serves to aid the government in certain circumstances. In doing so, however, the CAP does not lose its charitable aims or purposes.

■ Finally, CAP's funding supports the position that it is a charitable organization under the NJCIA. CAP's funding comes from a variety of sources, including private charitable donations, small fundraising efforts and government grants and contracts. Allenback Certification ¶ 6; Goldstein Certification, Ex. H. In the tax period beginning October 1, 1999 and ending September 30, 2000, CAP received approximately twenty-five percent of its support from private donations, thirty percent of its support from government grants and contracts, and the remaining funds from sources such as member dues, member activities and interest on investments. Goldstein Certification, Ex. H. At a minimum, "an organization claiming immunity under the Act must demonstrate some level of support from charitable donations and/or trust funds as it is those sources of income the Act seeks to protect." *Bieker*, 777 A.2d at 44; *see also Morales*, 694 A.2d at 602–03 (finding that "one of the essential characteristics" of a charitable organization is that it "receives a substantial amount of charitable contributions"); *Parker*, 579 A.2d at 366 (noting that government support does not undercut charitable status where the entity serves a charitable purpose and is "essentially supported through charitable contributions")

Here, the CAP actively seeks out charitable contributions and, in fact, receives approximately twenty-five percent of its income from those donations. This amount is sufficient to support a finding of charitable purpose. *See, e.g., Pelaez*, 624 A.2d at 1057 (granting charitable immunity to an organization that received over eighty (80) percent of its funding from government grants); *Morales*, 694 A.2d at 602 (granting charitable immunity to a corporation receiving nearly sixty (60) percent of its income from non-charitable sources); *cf Abdallah*, 798 A.2d at 136 (denying immunity to an organization that received less than two (2) percent of its income

from charitable giving); *Parker*, 579 A.2d at 365–66 (denying immunity to an entity formed solely to channel government funds and which failed to solicit any charitable donations).

Thus, the fact that CAP receives income from non-charitable sources does not disqualify it from claiming charitable status, nor does the common practice of "the federal, state and local governments [ ] appropriat[ing] funds for the operation of private hospitals, educational institutions, charities and other non-profit organizations which serve the public welfare" strip CAP of its immunity. *Morales*, 694 A.2d at 602. CAP does not make a profit from its government funding, nor does CAP exist solely to act as a conduit for those funds. CAP behaves no differently than most charities in cobbling together sufficient funding from a variety of sources to achieve its goals.

■ Taking all these factors together, this Court finds, as a matter of law, that CAP is a charitable organization under the NJCIA. Although CAP has undeniably close ties to the Air Force, nothing in the record suggests that CAP is trying to cloak itself in the guise of a non-profit charity in order to hide "some other form of enterprise." *Parker*, 579 A.2d at 364. Given the nature of CAP's aims, which are heavily focused on aerospace education and training, it is not surprising that it has a close relationship with the Air Force. It is equally clear, however, that CAP is a volunteer organization, focused on promoting the public good. Therefore, the Civil Air Patrol qualifies for charitable immunity under the New Jersey Charitable Immunity Act and the Court will grant its motion for summary judgment as to Counts II and III.

**B.**

The United States, the Army and the Air Force have also brought a motion for

summary judgment in this matter. As to Count I of Plaintiffs' complaint, these Defendants first argue that they are entitled to summary judgment because Nazzaro's negligence claim is barred under the doctrine of sovereign immunity. The sovereign immunity of the United States is well-established and it is clear that "the United States cannot be lawfully sued without its consent." *United States v. Lee*, 106 U.S. 196, 205, 1 S.Ct. 240, 27 L.Ed. 171 (1882). Only Congress has the power to consent to suit and in consenting, must do so explicitly. *See, e.g., Lane v. Pena*, 518 U.S. 187, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996).

■■■ Nazzaro's negligence claim against the United States, the Army and the Air Force is brought pursuant to one such expression of congressional consent, the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) (2003). The FTCA generally permits claims against the United States for damages:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. §§ 1346(b). Claims brought under the FTCA, however, may only be brought against the United States; federal agencies are never appropriate defendants. *See* 28 U.S.C. § 2679; *McKenith v. United States*, 771 F.Supp. 670, 673 (D.N.J.1991) (stating that the FTCA "does not provide this court with subject matter jurisdiction over any other defendant but the United States"); *Dilg v. United States Postal Service*, 635 F.Supp. 406, 407 (D.N.J.1985) (finding that the United States is the only

proper defendant in an suit brought through the FTCA and that "[i]ndividual agencies ... may not be sued in their own name in such a case"). Therefore, the Court will dismiss Plaintiffs' claims against the Army and Air Force for a lack of subject matter jurisdiction.[13] The Court, however, does have jurisdiction to hear Nazzaro's negligence claim as to the United States.

The FTCA, while broadly waiving sovereign immunity as to the United States, includes several exceptions to this waiver. 28 U.S.C. § 2680. The United States asserts that two of these exceptions, the "independent contractor" exception, and the "discretionary function" exception apply in this matter. The Court, however, finds United States' position as to both exceptions unpersuasive.

1.

■■■ The "independent contractor exception" is not contained in the statutory language of the FTCA "but has evolved from the FTCA provision that restricts recovery to injuries arising out of the acts and omissions of government employees and, according to the Supreme Court, excludes injuries caused by independent contractors." *Dugan v. Coastal Indus., Inc.*, 96 F.Supp.2d 481, 484 (E.D.Pa.2000) (internal citations omitted); *see also Norman v. United States*, 111 F.3d 356, 357 (3d Cir. 1997). The applicability of the exception turns on "whether the United States 'control[s] the physical conduct of the contractor in performance of the contract.'" *Dugan*, 96 F.Supp.2d at 483 (citing *Logue v. United States*, 412 U.S. 521, 527, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973)). Courts look not at "whether the [contractor] receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised

---

**13.** Mary Nazzaro's remaining claim for negligence and loss of consortium against the

United States will be addressed below in Section III.

by the Federal Government." *Id.* (internal citation omitted). Where the government "has the power 'to control the detailed physical performance of the contractor'" the contractor is deemed to be an employee and sovereign immunity is waived. *Id.* (internal citations omitted).

The United States claims that its license with CAP created an independent contractor relationship such that the United States retains its sovereign immunity under the FTCA. Reliance on this exception in the instant matter, however, is misplaced. In order for the independent contractor exception to be relevant, there must be a contract between the United States and CAP that requires CAP to perform some type of service for the government. *See, e.g., Norman,* 111 F.3d at 357–58 (applying the exception in a slip and fall case where United States had a contract with a maintenance company that gave the company broad responsibilities for and control over daily maintenance); *Williams v. United States,* 50 F.3d 299, 302 (4th Cir.1995) (applying the exception where a contract gave a maintenance company authority to repair, clean and make safe the premises on which plaintiff was injured); *Dugan,* 96 F.Supp.2d at 483–84 (denying the exception where the contract between the United States and a maintenance company did not contain explicit language stating that the contractor had authority or control over how maintenance was to be done). There is no such contract here. United States and CAP entered into a licensing agreement for the use of Fort Dix facilities. CAP did not contract to perform a service for the United States, it merely exercised its right under the license to use the confidence course to provide a recreational outing for some of its members. Therefore, the United States cannot claim immunity from suit under the independent contractor exception to the FTCA.

### 2.

The United States also claims immunity under the discretionary function exception to the FTCA. The United States' reliance on this exception, however, is equally inappropriate. The discretionary function exception bars claims against the United States where liability is based on "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. Varig Airlines,* 467 U.S. 797, 808, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

■ The discretionary function exception applies where two criteria are met. First, the conduct at issue must "involve[ ] an element of judgment or choice." *Berkovitz by Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). Thus, the exception does not apply where "a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow." *Id.* Second, the government action or decision must be "based on considerations of public policy." *Id.* at 536–37, 108 S.Ct. 1954; *see also United States v. Gaubert,* 499 U.S. 315, 325, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). This exception is "designed to protect policymaking by the politically accountable branches of government from interference in the form of 'second-guessing' by the judiciary—second guessing the result of which burdens the public fisc and the prospect of which skews the decision making process of executive and legislative policymakers." *Fisher Bros. Sales, Inc. v.*

*United States*, 46 F.3d 279, 284 (3d Cir. 1995) (en banc). As the Third Circuit has noted, the exception "does not apply to every situation in which there is an actual option to choose between courses of action or inaction. Rather, ... the discretion that is immunized from 'second-guessing' in the tort suit context applies to 'legislative and administrative decisions grounded in social, economic, and political policy.'" *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir.1997) (citing *Varig Airlines*, 467 U.S. at 814, 104 S.Ct. 2755). The types of choices covered under the exception include: "cabinet-level decision[s]" such as a decision to implement a fertilizer export program, *Dalehite v. United States*, 346 U.S. 15, 30–37, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); the General Service Administration's choice to sell surplus asbestos without warranties or warnings, *Smith v. Johns–Manville Corp.*, 795 F.2d 301, 304 (3d Cir.1986); and the decision by the Commissioner of the FDA to bar the importation of Chilean fruit into the United States, *Fisher Bros.*, 46 F.3d at 281.

■ The United States argues that the decision to allow the CAP to use Fort Dix facilities was a discretionary choice founded in policy goals of promoting community relationships. Although the decision whether or not to license, lease or rent land may be covered under the discretionary function exception, that decision does not form the basis for Nazzaro's complaint.[14] Nazzaro's position is not that the United States is negligent because it granted CAP a license, but rather because it breached a duty owed to him after the license was granted when the United States failed to provide instruction and supervision of the CAP event. That decision not to provide instruction or supervi-

sion, however, is an issue of common law landowner duty, not policy discretion and is "not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267; *see also Gotha*, 115 F.3d at 180–81 (refusing to apply the discretionary function exception where plaintiff brought a negligence suit against the United States for failing to provide stairs and adequate lighting on a naval base path, noting that a decision (or indecision) regarding the stairs and lighting on the path went "more to the issue of negligence ... than policy discretion").

The United States, however, argues that because "the decision to permit use of military facilities by independent groups is discretionary ... the terms of that use fall within that discretion." U.S. Def.'s Brief in Support of Mot. for Summary Judgment at 23. The FTCA, however, is designed to shield the government for liability for decisions made which involve official policy; it is not meant to protect every decision subsequently made, no matter how minute or administrative. To expand the reach of the discretionary function exception that far would be to eviscerate the FTCA and to insulate the United States from liability for nearly every act or decision of nearly every federal employee.

The Court is unpersuaded that a decision not to provide support, supervision or training to CAP members during their time at the Fort Dix confidence course is the type of decision contemplated by the discretionary function exception. Therefore, the Court finds that the United States cannot claim sovereign immunity under the FTCA under either the indepen-

---

**14.** It appears clear that the United States Defendants have the discretion to lease property to private parties, *see* Donnelly Decl. Ex. 12, and that that discretion is arguably founded in the policy decision to "benefit [ ] the US, promote the national defense or an Army mission, or be in the public interest." *Id.* ¶ 4–1(c).

dent contractor or discretionary function exceptions.

### 3.

Although the United States is subject to suit under the FTCA, the FTCA does "not itself create a substantive cause of action against the United States. Rather, it confer[s] a procedural remedy by which substantive state law c[an] be applied against the federal government." *Weber v. United States,* 991 F.Supp. 694, 696 (D.N.J.1998). Therefore, the " 'controlling question is whether the substantive law [of the state where the alleged wrong occurred] permits . . . recovery.' " *Id.* (citing *Certain Underwriters at Lloyd's v. United States,* 511 F.2d 159, 161 (5th Cir.1975)) (brackets in original). Here, the alleged wrong took place in New Jersey, therefore, New Jersey law controls.

■■■ Under New Jersey law, the United States claims that it is immune from suit pursuant to the New Jersey Landowner Liability Act ("LLA"), N.J. STAT. ANN. § 2A:42A–2 *et seq.* (West 2003). The LLA provides that:

a. An owner, lessee or occupant of premises . . . whether or not improved or maintained in a natural condition, or used as part of a commercial enterprise, owes no duty to keep the premises safe for entry or use by others for sport or recreational activities, or to give any warning of any hazardous condition of the land or in connection with the use of any structure or by reason of any activity on such premises to persons entering for such purposes;

b. An owner, lessee or occupant of premises who gives permission to another to enter upon such premises for a sport or recreational activity or purpose does not thereby (1) extend any assurance that the premises are safe for such purpose, or (2) constitute the person to whom permission is granted an invitee to whom a duty of care is owed, or (3) assume responsibility for or incur liability for any injury to person or property caused by any act of persons to whom the permission is granted.

N.J. STAT. ANN. § 2A:42A–3. Sport or recreational activities under the LLA include: "hunting, fishing, trapping, horseback riding, training of dogs, hiking, camping, picnicking, swimming, skating, skiing, sledding, tobogganing, operating or riding snowmobiles, all-terrain vehicles or dirt bikes, and any other outdoor sport, game and recreational activity including practice and instruction in any thereof." N.J. STAT. ANN. § 2A:42A–2. The LLA does not, however, grant immunity:

a. For willful or malicious failure to guard, or to warn against, a dangerous condition, use, structure or activity; or

b. For injury suffered in any case where permission to engage in sport or recreational activity on the premises was granted for a consideration other than the consideration, if any, paid to said landowner by the State; or

c. For injury caused, by acts of persons to whom permission to engage in sport or recreational activity was granted, to other persons as to whom the person granting permission, or the owner, lessee or occupant of the premises, owes a duty to keep the premises safe or to warn of danger.

N.J. STAT. ANN. § 2A:42A–4. The LLA is to be construed liberally "to serve as an inducement to the owners, lessees and occupants of property, that might otherwise be reluctant to do so for fear of liability, to permit persons to come onto their property for sport and recreational activities." N.J. STAT. ANN. § 2A:42A–5.1.

The current statute does not clearly define "premises," but does note that premises may be "improved or maintained in a natural condition." N.J. Stat. Ann. § 2A:42A-2. The LLA as originally enacted provided immunity where the lands used were "agricultural lands and woodlands." *Toogood v. St. Andrews at Valley Brook Condominium Association*, 313 N.J.Super. 418, 712 A.2d 1262, 1264 (1998)(thoroughly discussing the history of the LLA). In 1968, the New Jersey Legislature replaced the words "agricultural lands and woodlands" with "premises." *Id.* This change was not interpreted as a legislative decision to "enlarge the protected class of landowners to suburban landowners. Rather [the courts] held that this change was 'intended to better define, and perhaps somewhat broaden, the protected class originally specified.'" *Id.* (citing *Boileau v. DeCecco*, 125 N.J.Super. '263, 310 A.2d 497, 500 (1973)). In 1991, the Legislature again amended the act by adding the words "whether or not improved or maintained in a natural condition" to more fully describe "premises." *Id.* New Jersey courts have consistently held that "the amendments were designed to reinforce the long-standing interpretation of [the term premises] rather than to expand its meaning." *Id.* To this end, LLA immunity is extended to rural or semi-rural areas but not to "residential and populated neighborhoods." *Harrison v. Middlesex Water Co.*, 80 N.J. 391, 403 A.2d 910, 912 (1979); *see also Mancuso v. Klose*, 322 N.J.Super. 289, 730 A.2d 911, 913 (1999)

(finding the LLA inapplicable where child was hurt running across a neighbor's yard); *Benjamin v. Corcoran*, 268 N.J.Super. 517, 634 A.2d 108, 115 (1993) (denying LLA immunity to the New Jersey Fireman's Home for injuries suffered by child sledding on the grounds where the grounds were improved lands located in a suburban area). This Court has also addressed the definition of premises under the LLA. In *Weber v. United States*, 991 F.Supp. 694 (D.N.J.1998), the court found that a playground located on a thirty-five (35) acre park on Fort Dix was a premises covered under the LLA and granted the United States immunity from liability for plaintiff's injuries suffered when she fell from a swing set on the park.[15]

Given this well-established definition of premises under the LLA and the facts of this case, the United States is entitled to immunity under the LLA. The premises in question, the Fort Dix confidence course, is an outdoor, wooded area, improved only by obstacle-like structures. The area is so heavily wooded that persons using the course are given warnings and information about ticks and lyme disease. Donnelly Decl. Ex. 8 at 30, 115.[16] Thus, the Court is satisfied that the Fort Dix confidence course is not a suburban or residential area, but rather, is the type of open, undeveloped space contemplated under the LLA.

Additionally, the United States makes this property available to the public, as required for LLA immunity. As the *Too-*

---

**15.** In *Toogood v. St. Andrews at Valley Brook Condominium Association*, 313 N.J.Super. 418, 712 A.2d 1262, 1265 (1998), the Superior Court of New Jersey approved of the result in *Weber*, although the court did note that it did not agree with the court's statement that the liberal construction provision of the LLA announced a departure from the traditional definition of premises.

**16.** Fort Dix itself contains a 35 acre park, *Weber*, 991 F.Supp. at 695, and is bordered by a state forest, a wildlife management area and the Lakehurst Naval Air Engineering Center. *See* http://www.dix.army.mil (indicating that the Fort consists of just over 31,000 acres, 27,765 acres of which are used for training and maneuvers and that the Fort is bordered by the 26,000 acre Lebanon State Forest, 34,-900 acres of Wildlife Management Area and the Lakehurst facility (2,100 acres)).

*good* court noted, "maintenance of an open tract of land and allowance of access by the general public for passive or active recreational purposes are precisely the types of conduct the Legislature seeks to encourage." *Toogood*, 712 A.2d at 1265. Although the course was open to the public only through licenses, the LLA does not require that owners/lessees or occupants make land completely open to the public at all times, only that they give permission for others to use the property. *See* N.J. STAT. ANN. § 2A:42A–3. Further, CAP's use of the confidence course was recreational in nature. CAP planned a social outing for its members and participants were told to have fun during the day. Donnelly Decl. Ex. 7 at 47, 53. The outing was not a part of formal training, nor were participants involved in a noncombat mission for the Air Force. The record clearly indicates, therefore, that CAP members were engaged in "outdoor sport, game and recreational activity" as required under the LLA. N.J. STAT. ANN. § 2A:42A–2.

Finally, nothing in the record indicates that the United States willfully or maliciously failed "to guard, or to warn against, a dangerous condition, use, structure or activity." *See* N.J. STAT. ANN. § 2A:42A–4. The dangers of the confidence course are open and obvious and there is no indication that the "tough one" was defective or improperly maintained. In addition, the United States did not receive a fee for the use of the confidence course.[17]

In short, the United States is entitled to immunity from liability for Nazzaro's injuries pursuant to the LLA.[18] Therefore, this Court will grant United States' motion for summary judgment as to Count I of Plaintiffs' Complaint. The only remaining claim before the Court, therefore, is Mary Nazzaro's claim for negligence and loss of society, services and consortium against the United States.

17. Although the License provides that the "[l]icensee shall pay a service fee, if any, to the appropriate Fort Dix activity the costs associated with using Army facilities," Donnelly Decl. Ex. 5 ¶ 5, nothing in the record indicates that the CAP was actually charged a fee for the use of the confidence course.

18. Because the United States is immune from suit under the LLA, the Court need not address the substance of Nazzaro's negligence claim for resolution of this matter. However, if the United States were ineligible for immunity under the LLA, it would be entitled to summary judgment because the United States did not breach any duty owed to Nazzaro. Common law liability of landowners is based on the status of the injured party. *Taneian v. Meghrigian*, 15 N.J. 267, 104 A.2d 689 (1954) (discussing landowner liability for injuries suffered by trespassers, licensees, and invitees); *see also Weber*, 991 F.Supp. at 698. Here, Nazzaro was clearly a licensee because his presence on Fort Dix was the result of the licensing agreement between the United States and CAP. Licensees are not deemed to be invited on property, rather, landowners "suffer" their presence. *Weber*, 991 F.Supp. at 698; *see also Snyder v. I. Jay Realty Co.*, 30 N.J. 303, 153 A.2d 1, 5–6 (1959). To satisfy the duty owed a licensee, a landowner "is required neither to inspect his land in order to discover defects, nor to maintain the premises in a safe condition. If the landowner knows of a dangerous condition, however, and believes that his licensee is unlikely to discover it on his own, he is under no obligation either to make the condition reasonably safe or to warn his licensee of the danger." *Weber*, 991 F.Supp. at 698; *see also Handleman v. Cox*, 39 N.J. 95, 187 A.2d 708, 712 (1963).

Here, the dangers of the confidence course, and particularly the "tough one" could hardly be more clear. There is nothing hidden about the real risk of injury from climbing a 30 foot cargo net. In addition, there is nothing in the record indicating that the "tough one" was defective. The obstacle was properly built and maintained. Nazzaro could hardly have been unaware that he could be hurt if he fell. Therefore, the United States satisfied its duty under the common law and would not be found negligent if a Nazzaro's negligence claim were permitted to proceed.

### III.

■ The United States moves to dismiss Count III of Plaintiffs' Complaint pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. In a motion to dismiss on the basis of Rule 12(b)(1),

> no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does not in fact exist.

*Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977); *see also Courtney v. Choplin,* 195 F.Supp.2d 649, 650 (D.N.J.2002).

As noted above, "[i]t is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *see also Jaffee v. United States,* 592 F.2d 712, 718 (3d Cir.1979). Although the FTCA provides this consent, waiver of sovereign immunity under the FTCA is contingent upon plaintiff complying with the provisions of the Act. Specifically, the FTCA requires that before bringing suit against the United States, "the claimant shall have first presented the claim to the appropriate federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail." 28 U.S.C. § 2675 (2003). "Fulfillment of the administrative exhaustion requirement is essential to a court's subject matter jurisdiction over a claim under the FTCA." *Martinez v. United States Post Office,* 875 F.Supp. 1067, 1074 (D.N.J.1995); *see also McNeil v. United States,* 508 U.S. 106, 111, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993); *Tucker v. United States Postal Service,* 676 F.2d 954, 959 (3d Cir.1982). Nothing in the record indicates that Mary Nazzaro presented her claim to a federal agency prior to initiating this suit. Therefore, because Mrs. Nazzaro has failed to exhaust her administrative remedies, this Court lacks jurisdiction to hear her claim. The Court will grant United States' motion to dismiss Count III of Plaintiffs' complaint.

### IV.

For the reasons detailed in this opinion, the Court will grant Defendants' motions for summary judgment and motion to dismiss. The Court will issue an appropriate order.

### ORDER

Currently before the Court are Defendant Civil Air Patrol's Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56(c) and Defendants United States of America, Department of the Army and Department of the Air Force's Motion for Summary Judgment and Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(1). The Court having reviewed the submissions of the parties and having heard oral arguments on December 30, 2003, for the reasons set forth in an opinion issued by this Court, which findings of fact and conclusions of law are incorporated herein by reference, and for good cause appearing,

**IT IS** on this *28th* day of January, 2004,

**ORDERED THAT:**

1. Defendant Civil Air Patrol's Motion for Summary Judgment is **GRANTED.** Count II of Plaintiffs' Complaint is hereby **DISMISSED WITH PREJUDICE.** Count III of Plaintiffs' Complaint, as it pertains to Defendant Civil Air Patrol is also hereby **DISMISSED WITH PREJUDICE.**

2. Defendants United States, United States Department of the Army and

United States Department of the Air Force's Motion for Summary Judgment is **GRANTED.** Count I of Plaintiffs' complaint is hereby **DISMISSED WITH PREJUDICE.**

3. Defendants United States, United States Department of the Army and United States Department of the Air Force's Motion to Dismiss Count III of Plaintiffs' Complaint is **GRANTED.**