SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

## <u>Cassandra Gigi Smith v. Newark Community Health Centers, Inc.</u>
### (A-67-24) (089809)

**Argued November 3, 2025 -- Decided June 10, 2026**

**JUSTICE WAINER APTER, writing for a unanimous Court.**

In this appeal, the Court considers whether Newark Community Health Centers, Inc. (NCHC) -- a federally qualified health center founded to "provide affordable, quality healthcare" to underserved populations -- is entitled to immunity under New Jersey's Charitable Immunity Act (CIA) as an entity "organized exclusively for religious, charitable or educational purposes," N.J.S.A. 2A:53A-7(a), or is instead entitled only to a $250,000 cap on damages as an entity "organized exclusively for hospital purposes," id. at -8.

Plaintiff Cassandra Gigi Smith alleges that she slipped and fell as she was leaving the examination room at defendant NCHC's East Orange location in 2019, sustaining multiple serious and permanent injuries. NCHC moved for summary judgment, arguing that it was entitled to immunity under N.J.S.A. 2A:53A-7(a).

According to its website, NCHC is a federally qualified health center founded "to address growing health disparities plaguing underserved populations in the City of Newark." Its mission is "to provide affordable, high quality, and accessible healthcare to the communities that we serve." The mission statement explains that NCHC's "primary goal is to eliminate health disparities and help people live stronger, healthier, and happier lives." NCHC's Certificate of Incorporation states that it was "formed for scientific, educational and charitable purposes" and lists 16 separate purposes. Its 2019 tax return lists $33,819,482 in total revenue, including $51,460 from fundraising events and $51,528 from other contributions, grants, and gifts. NCHC's chief operating officer testified that as a federally qualified health center, NCHC "work[ed] delivering primary care to patients, regardless of their ability to pay." NCHC submitted seven flyers publicizing its various events.

The trial court granted summary judgment to NCHC, holding there was no genuine issue of material fact that NCHC was "organized exclusively for religious, charitable or educational purposes." The Appellate Division affirmed. The Court granted certification. 260 N.J. 564 (2025).

1

**HELD:** As a provider of medical and dental services, NCHC is organized exclusively for hospital purposes under N.J.S.A. 2A:53A-7(b) and -8. It is therefore entitled only to the cap on damages under N.J.S.A. 2A:53A-8.

1. The CIA provides certain nonprofit entities immunity from negligence claims. As the text of N.J.S.A. 2A:53A-7 makes clear, the main difference between immunity for a nonprofit corporation organized exclusively for "religious, charitable or educational purposes" under subsection (a) -- versus one organized exclusively for "hospital purposes" under subsection (b) -- is that for the former, the "employees, agents, [and] servants" of the nonprofit are also immune, whereas for the latter, they are not. N.J.S.A. 2A:53A-8 then sets forth an exception to immunity for nonprofit corporations organized "exclusively for hospital purposes," limiting liability "to an amount not exceeding $250,000, together with interest and costs of suit, as the result of any one accident." N.J.S.A. 2A:53A-10 requires that the CIA "be liberally construed so as to afford immunity . . . as provided herein." The Court has interpreted Section 10 to mean that it is not the Court's province to engraft exceptions onto the charitable immunity doctrine. (pp. 12-15)

2. As used in Section 7(a), the terms "educational" and "religious" have limited and commonly understood meanings and should be read literally. The word "charitable," on the other hand, defies precise definition. Therefore, courts engage in a source-of-funds assessment for entities seeking to prove that they are organized exclusively for charitable purposes. The word "exclusively," as used in Sections 7 and 8, has been interpreted as meaning single or sole. However, ancillary services do not prevent a finding that an entity is organized "exclusively" for religious, charitable, or educational purposes or for hospital purposes. The core question is the dominant motive of the entity. (pp. 16-17)

3. The Court reviews instructive cases, including Kuchera v. Jersey Shore Family Health Center, 221 N.J. 239 (2015). In Kuchera, the plaintiff slipped and fell on "an oily substance" while attending a free eye screening run by the New Jersey Commission for the Blind and Visually Impaired at the Jersey Shore Family Health Center, a part of the Meridian Health system that provided free medical care for underserved communities. Id. at 242-43. Interpreting the words "organized exclusively for hospital purposes," the Court explained that "[t]he modern hospital is now a place where members of the community" seek not only "emergency services but also preventative services, therapy, educational programs, and counseling." Id. at 249, 251. Acknowledging that "[t]he education of medical students, physicians, [and] nurses . . . is a significant core hospital purpose," and that "[t]he provision of charity care," or medical care to those who cannot afford to pay, was also "a core function of a hospital," the Court held that the defendants were "organized exclusively for hospital purposes" and could be held liable for negligence up to the damages cap in Section 8. Id. at 254-55. (pp. 18-20)

4.  The undisputed facts in the record here demonstrate that NCHC is organized exclusively for hospital purposes, not exclusively for educational or charitable purposes.  Courts look to an entity's dominant motive to determine its purpose.  Reviewing in detail the evidence NCHC submitted to the trial court, the Court concludes that NCHC's dominant motive is providing healthcare, not education.  Further, NCHC fails any source-of-funding analysis because almost none of its revenue comes from charitable contributions.  It is therefore not organized exclusively for charitable purposes.  Rather, it is organized exclusively for hospital purposes under Sections 7(b) and 8 of the CIA.  The Court explained in Kuchera that a modern hospital is "organized to engage in a series of activities relating to the improvement of human health and the provision of care to the sick, injured, and disabled."  Id. at 252-53.  That describes NCHC's work perfectly.  NCHC is therefore not entitled to immunity, but to the $250,000 cap on damages under N.J.S.A. 2A:53A-8.  (pp. 20-25)

**REVERSED and REMANDED for further proceedings.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, FASCIALE, NORIEGA, and HOFFMAN join in JUSTICE WAINER APTER's opinion.**

3

# SUPREME COURT OF NEW JERSEY
## A-67 September Term 2024
### 089809

Cassandra Gigi Smith,

Plaintiff-Appellant,

v.

Newark Community
Health Centers, Inc.,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|--------|---------|
| November 3, 2025 | June 10, 2026 |

Margaret E. Quinlan argued the cause for appellant
(Lowenthal & Abrams, attorneys; Margaret E. Quinlan,
on the brief).

Jaunice M. Canning argued the cause for respondent
(Law Offices of James H. Rohlfing, attorneys; Samuel P.
Reisen, on the brief).

Jonathan H. Lomurro argued the cause for amicus curiae
New Jersey Association for Justice (Lomurro Munson,
attorneys; Jonathan H. Lomurro and Abbott S. Brown, of
counsel, Christina Vassiliou Harvey, of counsel and on
the brief, and Spencer A. Sink, on the brief).

JUSTICE WAINER APTER delivered the opinion of the Court.

In this case, we decide whether Newark Community Health Centers, Inc. (NCHC) -- a federally qualified health center founded to "provide affordable, quality healthcare" to underserved populations -- is entitled to immunity under New Jersey's Charitable Immunity Act (CIA) as an entity "organized exclusively for religious, charitable or educational purposes," N.J.S.A. 2A:53A-7(a), or is instead entitled only to a $250,000 cap on damages as an entity "organized exclusively for hospital purposes," id. at -8. We hold it is entitled only to the cap on damages.

There is no dispute that NCHC is not organized exclusively for religious purposes. Its mission statement and Certificate of Incorporation (COI) make clear that it is organized to provide healthcare -- not an exclusively educational purpose. And it is not organized exclusively for charitable purposes because almost none of its funding comes from charitable sources. Instead, as a provider of medical and dental services, NCHC is organized exclusively for hospital purposes under N.J.S.A. 2A:53A-7(b) and -8. We therefore reverse the Appellate Division's judgment and remand for further proceedings.

I.

Plaintiff Cassandra Gigi Smith visited defendant NCHC's East Orange location on February 14, 2019 for medical treatment. She was insured by Medicare at the time.

2

Smith alleges that she slipped on water and fell as she was leaving the examination room, sustaining multiple serious and permanent injuries. In 2021, Smith sued NCHC and various unnamed John and Jane Doe defendants for negligence, seeking compensatory damages.

NCHC moved for summary judgment. NCHC argued that it was entitled to immunity under N.J.S.A. 2A:53A-7(a) because it was organized exclusively for religious, charitable, or educational purposes. In support of its motion, NCHC submitted screenshots from its website, its COI, its 2019 tax return, deposition testimony from its chief operating officer (COO), and seven flyers.

According to its website, NCHC was founded in 1986 as a federally qualified health center "to address growing health disparities plaguing underserved populations in the City of Newark." Its mission is "to provide affordable, high quality, and accessible healthcare to the communities that we serve." The mission statement continues: "As one of the largest providers of comprehensive primary care services for uninsured and medically underserved populations . . . , our primary goal is to eliminate health disparities and help people live stronger, healthier, and happier lives." NCHC runs seven health centers across the State providing "a full range of medical and dental services for children, adults, and seniors."

3

NCHC's COI states that it was "formed for scientific, educational and charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code."  It lists 16 separate purposes:

A. To provide comprehensive primary health services including the services of physicians, physician's assistants, nurse clinicians and other health providers; dental services, diagnostic laboratory and radiologic services, preventive health services . . . , emergency medical services and transportation services required for adequate patient care;

B. To provide as appropriate supplemental health services, including hospital services, home health services, extended care facilities services, rehabilitative services . . . and long term physical medicine, dental services, vision services, allied health services, pharmaceutical services, therapeutic radiologic services, public health services (including nutrition, education and social services), health education services and services which promote optimal use of primary and supplementary health services including as necessary and appropriate services of bi-lingual outreach workers;

C. To provide referrals to providers of supplemental health services and payment, as appropriate and feasible for their provision of such services;

D. To provide, as may be appropriate, environmental health services;

E. To provide, directly or indirectly, to the public or other health care providers, health care and related services;

4

F. To aid other health care providers by making available to such entities consulting, administrative, advisory, managerial, long range planning and other services and advice;

G. To serve as an active partner with the consumer, business labor, professional and political groups and leaders to identify, address and take action on the region's short and long term public health, environmental and medical problems;

H. To advance the health status of the region's population through the provision of appropriate health and medical care, programs of education, and research activity;

I. To conduct and support research in the area of health services delivery and health education;

J. To provide educational programs for resident-physicians, medical nursing students, and members of other health care professions;

K. To provide information on the availability and proper use of health services;

L. To conduct or support health care educational programs for health care providers, health care managers and general public;

M. To engage in or support scientific, clinical and health systems research and disseminate the results thereof;

N. To raise funds from private donations and to apply for and receive governmental private grants and loans;

O. To bill for services rendered on a contractual, fee for services or insurance basis; and

P. To carry on any activity and to deal with and expand any property or income therefrom for any of the foregoing purposes in such manner as in the judgment of the Board of Trustees will best promote the purpose of the corporation, without limitation, except such limitations, if any, as may be contained in the Certificate of Incorporation, or any other limitations as are prescribed by law.

NCHC's 2019 tax return lists $33,819,482 in total revenue. That includes $9,566,603 in government grants; $51,460 from fundraising events; and $51,528 from other contributions, grants, and gifts.

NCHC's COO testified that as a federally qualified health center, NCHC "work[ed] delivering primary care to patients, regardless of their ability to pay." In addition, NCHC submitted seven flyers publicizing: (1) an event with United Healthcare Community Plan and the Partnership for Maternal and Child Health of Northern New Jersey for Black Maternal Health Week; (2) ten outreach events for World AIDS Month; (3) the Sixth Annual Virtual Women's Health Symposium Fundraiser and a COVID-19 health fair; (4) free rapid HIV testing; (5) appointments for back-to-school immunizations and physicals in 2021; (6) six outreach events for Colorectal Cancer Awareness Month; and (7) appointments for back-to-school physicals in 2022-2023.[1]

---

[1] NCHC also submitted one flyer from United Healthcare Community Plan that is not relevant to this case.

The trial court granted summary judgment to NCHC, holding there was no genuine issue of material fact that NCHC was "organized exclusively for religious, charitable or educational purposes." The court relied on the COI -- which it stated "show[ed] exclusively charitable and educational purposes" -- and the testimony of NCHC's COO discussed above. It held that "providing health care services" was "included within [NCHC's] objectives and purposes." But it concluded that NCHC was not "organized exclusively for hospital purposes" because the COI "shows a wider range of purposes and powers than providing health care services."

The Appellate Division affirmed. In concluding that NCHC was "organized exclusively for educational purposes," the Appellate Division relied on its prior holdings that Little League Baseball of Collingswood; a nonprofit athletic association that sponsored a three-day soccer tournament; a nonprofit swim club "organized to train swimmers at various competitive levels"; and the New Jersey Academy of Aquatic Sciences, which operated the New Jersey State Aquarium, were all "organized exclusively for educational purposes." (citing Pomeroy v. Little League Baseball of Collingswood, 142 N.J. Super. 471, 474 (App. Div. 1976); Roberts v. Timber Birch-Broadmoore Athletic Ass'n, 371 N.J. Super. 189, 192, 194 (App. Div. 2004); Auerbach v. Jersey Wahoos Swim Club, 368 N.J. Super. 403, 406, 413 (App. Div. 2004);

7

Morales v. N.J. Acad. of Aquatic Scis., 302 N.J. Super. 50, 54 (App. Div. 1997)).  The appellate court also relied on Rupp v. Brookdale Baptist Church, in which it held that a church that operated a day camp to "integrate biblical truth into the lives of the children through formal teaching and informal activities" was organized exclusively for religious, charitable, and educational purposes.  242 N.J. Super. 457, 459, 461 (App. Div. 1990).

Analogizing to those cases, the Appellate Division held that "the medical services rendered in this case did not thwart defendant's educational purpose."  Because the court concluded that NCHC was organized exclusively for educational purposes, it did not undertake the source-of-funding analysis required by Bieker v. Community House of Moorestown, 169 N.J. 167, 178-79 (2001), for nonprofits organized exclusively for charitable purposes.  The Appellate Division also rejected Smith's argument that NCHC was organized exclusively for hospital purposes, because "unlike the health care facility in Kuchera [v. Jersey Shore Family Health Center, 221 N.J. 239, 252-53 (2015)], defendant is neither owned nor operated by a nonprofit hospital."

We granted Smith's petition for certification.  260 N.J. 564 (2025).  We also granted leave to appear as amicus curiae to the New Jersey Association for Justice (NJAJ).

II.

Smith argues that the Appellate Division erred in concluding that NCHC was entitled to full immunity under Section 7(a), rather than Section 8's $250,000 cap on damages. She contends that NCHC is not organized exclusively for educational purposes because it is "a comprehensive group of medical practices and facilities whose primary purpose is to provide medical treatment," not to teach. And NCHC is not organized exclusively for charitable purposes, Smith maintains, because charitable contributions comprise "less than 3/10 of one percent" of its total revenue -- "an intolerable sum according to the precedent." Instead, Smith avers, NCHC is subject to the $250,000 cap on damages under Section 8 because of this Court's broad reading of the words "hospital purposes" in Kuchera.

NCHC argues that it is organized exclusively for educational purposes because it "promotes, creates, and sponsors monthly outreach events to educate and inform the community on pressing healthcare topics, solutions and resources." Its provision of healthcare services, NCHC maintains, "does not negate the fact" that it is "organized to provide educational services." NCHC also asserts that it meets the source-of-funding analysis required to be organized exclusively for charitable purposes. And, NCHC contends, it is not

9

organized exclusively for hospital purposes because it "is not owned nor operated by a hospital facility."

NJAJ asks this Court to make clear that Section 7 does not apply to healthcare providers. It emphasizes Sections 7 and 8's use of the word "exclusively" and contends that the trial and appellate courts ignored the statutory text in concluding that NCHC was organized exclusively for educational purposes, because "NCHC's mission admits its goal is healthcare -- not education." Unlike Smith, NJAJ asserts that NCHC was not formed exclusively for hospital purposes under Section 8 because, unlike the facility in Kuchera, "NCHC is not owned or operated by a hospital, nor is it incorporated for the sole purpose of maintaining hospital services."

## III.

If there are "no material facts in dispute," the question of whether a defendant is "organized for exclusively" educational, charitable, or hospital purposes is a question of law for the court that we review de novo. Est. of Komninos v. Bancroft Neurohealth, Inc., 417 N.J. Super. 309, 318 (App. Div. 2010); Green v. Monmouth Univ., 237 N.J. 516, 529 (2019).

Charitable immunity under the CIA is an affirmative defense for which "defendants bear the burden of persuasion." Abdallah v. Occupational Ctr. of Hudson Cnty., 351 N.J. Super. 280, 288 (App. Div. 2002). In interpreting the

10

CIA, "[w]e ascribe to the statutory words their ordinary meaning and significance and read them in context . . . so as to give sense to the legislation as a whole." DiProspero v. Penn, 183 N.J. 477, 492 (2005) (citation omitted); see also N.J.S.A. 1:1-1 (statutory "words and phrases shall be read . . . [in] context, and shall . . . be given their generally accepted meaning, according to the approved usage of the language").

Charitable immunity was originally a judge-made doctrine recognized by the Court of Errors and Appeals in 1925. See D'Amato v. Orange Mem'l Hosp., 101 N.J.L. 61, 65 (E. & A. 1925). It was grounded in the view "that it would be contrary to the interests of society" for "funds dedicated to a charitable use . . . to be diverted or diminished by the payment of judgments resulting from the torts of agents, servants or employees of the organization or institution administering the charity where suit is instituted by the beneficiary of the charity." Jones v. St. Mary's Roman Cath. Church, 7 N.J. 533, 537 (1951).

In three cases in 1958, this Court repudiated the doctrine, finding it contrary to "modern concepts of justice." Collopy v. Newark Eye & Ear Infirmary, 27 N.J. 29, 47-48 (1958); see also Dalton v. St. Luke's Cath. Church, 27 N.J. 22 (1958); Benton v. YMCA of Westfield, 27 N.J. 67 (1958). The Legislature disagreed and immediately passed a temporary measure to

11

restore charitable immunity. L. 1958, c. 131 (expired 1959); Governor's Statement Upon Signing S. 204 (July 22, 1958). The next year, the Legislature made those provisions permanent by enacting the Charitable Immunity Act of 1959. See L. 1959, c. 90 (codified at N.J.S.A. 2A:53A-7 to -11).

The CIA originally granted immunity to nonprofit corporations organized exclusively for "religious, charitable, educational or hospital purposes." See N.J.S.A. 2A:53A-7 (1959). In 1995, however, the Legislature created a separate subsection, 7(b), for nonprofit corporations organized exclusively for hospital purposes. See L. 1995, c. 183, § 1.[2]

In its current form, the CIA provides certain nonprofit entities immunity from negligence claims. N.J.S.A. 2A:53A-7 to -11. Section 7 sets forth the standard:

> a. No nonprofit corporation, society or association organized exclusively for religious, charitable or educational purposes or its trustees, directors, officers, employees, agents, servants or volunteers shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or

---

[2] The Legislature also added both a second paragraph to subsection (a) and a subsection (c) to N.J.S.A. 2A:53A-7 at that time. See L. 1995, c. 183, § 1.

12

association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association.

Nothing in this subsection shall be deemed to grant immunity to any health care provider, in the practice of his profession, who is a compensated employee, agent or servant of any nonprofit corporation, society or association organized exclusively for religious, charitable or educational purposes.

b. No nonprofit corporation, society or association organized exclusively for hospital purposes or its trustees, directors, officers or volunteers shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association; but nothing herein contained shall be deemed to exempt the agent, employee or servant individually from their liability for any such negligence.

c. Nothing in this section shall be deemed to grant immunity to: (1) any nonprofit corporation, society or association organized exclusively for religious, charitable, educational or hospital purposes, or its trustee, director, officer, employee, agent, servant or volunteer, causing damage by a willful, wanton or grossly negligent act of commission or omission,

including sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in [N.J.S.A. 2A:30B-2], or sexual abuse as defined in [N.J.S.A. 2A:61B-1]; (2) any trustee, director, officer, employee, agent, servant or volunteer causing damage as the result of the negligent operation of a motor vehicle; or (3) an independent contractor of a nonprofit corporation, society or association organized exclusively for religious, charitable, educational or hospital purposes.

[N.J.S.A. 2A:53A-7.]

As the text makes clear, the main difference between immunity for a nonprofit corporation organized exclusively for "religious, charitable or educational purposes" under subsection (a) -- versus one organized exclusively for "hospital purposes" under subsection (b) -- is that for the former, the "employees, agents, [and] servants" of the nonprofit are also immune, whereas for the latter, they are not. See N.J.S.A. 2A:53A-7(a), (b); see also Sponsors' Statement to A. 1775 (May 12, 1994) (explaining that the 1995 amendment "separates the language referring to nonprofit corporations, societies or associations organized exclusively for hospital purposes and does not provide extended immunity to individuals associated with these institutions").

Section 8 then sets forth an exception to immunity for nonprofit corporations organized "exclusively for hospital purposes":

Notwithstanding the provisions of the foregoing paragraph, any nonprofit corporation, society or association organized exclusively for hospital purposes shall be liable to respond in damages to such

14

beneficiary who shall suffer damage from the negligence of such corporation, society or association or of its agents or servants to an amount not exceeding $250,000, together with interest and costs of suit, as the result of any one accident and to the extent to which such damage, together with interest and costs of suit, shall exceed the sum of $250,000 such nonprofit corporation, society or association organized exclusively for hospital purposes shall not be liable therefor.

[N.J.S.A. 2A:53A-8.][3]

In beginning with the words "[n]otwithstanding the provisions of the foregoing paragraph," the Legislature mandated that when Sections 7(b) and 8 conflict, Section 8 controls. Ibid.

Section 10 requires that the CIA be liberally construed:

[The Act] shall be deemed to be remedial and shall be liberally construed so as to afford immunity to the said corporations, societies and associations from liability as provided herein in furtherance of the public policy for the protection of nonprofit corporations, societies and associations organized for religious, charitable, educational or hospital purposes.

[N.J.S.A. 2A:53A-10.]

This Court has interpreted Section 10 to mean that "[i]t is not the Court's province 'to engraft exceptions onto the charitable immunity doctrine.'"

---

[3] Section 8 has been in place since 1959. It originally capped damages at $10,000. See N.J.S.A. 2A:53A-8 (1959). The Legislature raised the cap from $10,000 to $250,000 in 1991. See L. 1991, c. 187, § 48.

15

O'Connell v. State, 171 N.J. 484, 499 (2002) (quoting Schultz v. Roman Cath. Archdiocese of Newark, 95 N.J. 530, 539 (1984)).

The CIA's grant of immunity serves two primary purposes:  to "preserve[] a charity's assets" and to "recognize[] that a beneficiary of the services of a charitable organization has entered into a relationship that exempts the benefactor from liability."  Kuchera, 221 N.J. at 247.

As used in Section 7(a), the terms "educational" and "religious" have "limited and commonly understood meaning[s]" and should be read literally. Ryan v. Holy Trinity Evangelical Lutheran Church, 175 N.J. 333, 343 (2003). The word "charitable," on the other hand, "is a more complex notion that defies precise definition."  Ibid.

Therefore, although no "financial analysis is required" for entities organized exclusively for educational or religious purposes, courts must engage in "a source of funds assessment" for "[e]ntities seeking the shelter of the Act by proving that they are organized exclusively for charitable purposes."  Id. at 346 (quotation omitted).  The source-of-funds analysis requires that "an organization claiming [charitable] immunity under the Act . . . demonstrate some level of support from charitable donations and/or trust funds as it is those sources of income the Act seeks to protect."  Bieker, 169 N.J. at 178.  "'[T]he fact that a [nonprofit corporation] happens to receive

16

some government support would not alter its nature as a charity for immunity purposes' if it performs charitable services and is 'essentially supported through charitable contributions.'" Nazzaro v. United States, 304 F. Supp. 2d 605, 611 (D.N.J. 2004) (second alteration in original) (quoting Morales, 302 N.J. Super. at 55). However, entities seeking charitable immunity cannot primarily rely on government funding or on charging fees to for-profit entities. Bieker, 169 N.J. at 178-79; Parker v. St. Stephen's Urban Dev. Corp., Inc., 243 N.J. Super. 317, 325-27 (App. Div. 1990).

The word "exclusively," as used in Sections 7 and 8, "has been interpreted as meaning single or sole." Kuchera, 221 N.J. at 249. However, "ancillary services" do not prevent a finding that an entity is organized "exclusively" for religious, charitable, or educational purposes, Ryan, 175 N.J. at 349, or "exclusively" for hospital purposes, if the ancillary services advance the entity's religious, educational, charitable, or hospital mission, see Kuchera, 221 N.J. at 254-55. The core question is the "dominant motive" of the entity. Bieker, 169 N.J. at 171 (quoting Parker, 243 N.J. Super. at 325).

And because Section 7 provides immunity in a suit brought by a plaintiff who is "a beneficiary, to whatever degree" of the nonprofit's works, N.J.S.A. 2A:53A-7(a) and (b), the word "beneficiary" "is to be interpreted broadly." Ryan, 175 N.J. at 353. "Those who are not beneficiaries must be 'unconcerned

17

in and unrelated to' the benefactions of" the religious, charitable, educational, or hospital work of the organization. Ibid. (quoting Gray v. St. Cecilia's Sch., 217 N.J. Super. 492, 495 (App. Div. 1987)).

Here, the question is whether NCHC is organized exclusively for religious, charitable, or educational purposes on the one hand, or exclusively for hospital purposes on the other. Two of our prior cases are instructive.

In Ryan, the plaintiff alleged that she was injured while attending a meeting of the "Mothers' Center" at Holy Trinity Evangelical Lutheran Church. Id. at 336. We determined that the Mothers' Center, a "nonprofit group of parents and expectant mothers organized to exchange experiences and receive information regarding childbirth, child rearing, mothering, and family relationships," was organized exclusively for educational purposes. Id. at 336-37, 347.

The Mothers' Center's purpose was "to promote the welfare and meet the needs of mothers . . . through an education program directed toward parents." Id. at 337 (internal quotation marks omitted). The plaintiffs argued that its programming was not educational. Id. at 348. This Court concluded that "the Mothers' Center is organized exclusively to educate all interested parents . . . about birth and childrearing," a subject that, while not "academic," was "serious and important." Id. at 348-49; see also Green, 237 N.J. at 531,

18

537-38 (noting that it was undisputed that Monmouth University was a nonprofit corporation organized exclusively for educational purposes).

In Kuchera, the plaintiff slipped and fell on "an oily substance" on the floor while attending a free eye screening run by the New Jersey Commission for the Blind and Visually Impaired. 221 N.J. at 242-43. The screening was run by Commission staff at the Jersey Shore Family Health Center, which was part of the Meridian Health system and located in a building next to the Jersey Shore University Medical Center. Ibid. The Family Health Center provided free medical care for underserved communities. Id. at 243. Kuchera sued the Family Health Center, the Medical Center, and Meridian Health. Id. at 244.

The trial court dismissed the complaint on summary judgment, holding that the defendants were entitled to immunity under Section 7(a) because they were organized for "a hybrid purpose that includes educational and charitable services as well as the operation of a hospital." Id. at 244-45. The Appellate Division affirmed; this Court reversed. Id. at 242.

Interpreting the words "organized exclusively for hospital purposes," the Court explained that "[t]he modern hospital is now a place where members of the community" seek not only "emergency services but also preventative services, therapy, educational programs, and counseling." Id. at 249, 251. It emphasized that Meridian Health identified "its core hospital mission as

19

providing not only inpatient" and outpatient medical care, but also "as addressing the public health needs of the community in which its constituent units are located." Id. at 253. The Court noted that the Family Health Center was "an integral unit of the Meridian Health system." Id. at 254.

Acknowledging that "[t]he education of medical students, physicians, [and] nurses . . . is a significant core hospital purpose," and that "[t]he provision of charity care," or medical care to those who cannot afford to pay, was also "a core function of a hospital," the Court held that the defendants were not immune from liability as nonprofit corporations organized exclusively for educational or charitable purposes under Section 7(a). Id. at 254-55. Instead, they were "organized exclusively for hospital purposes" and could be held liable for negligence up to the damages cap in Section 8. Ibid.

## IV.

We hold that the undisputed facts in the record demonstrate that NCHC is organized exclusively for hospital purposes, not exclusively for educational or charitable purposes, under the CIA. It is therefore not entitled to immunity, but to the $250,000 cap on damages under N.J.S.A. 2A:53A-8.

We look to an entity's "dominant motive" to determine its purpose. See Ryan, 175 N.J. at 344-45. The evidence that NCHC submitted to the trial court shows that its dominant motive is providing healthcare, not education.

20

NCHC was founded in 1986 as a federally qualified health center "to address growing health disparities" in Newark. It has since grown to seven locations, each providing "a full range of medical and dental services for children, adults, and seniors." Its official mission is "to provide affordable, high quality, and accessible healthcare." Its mission statement also declares: "As one of the largest providers of comprehensive primary care services for uninsured and medically underserved populations . . . , our primary goal is to eliminate health disparities and help people live . . . healthier . . . lives." And NCHC's COO testified that it "deliver[s] primary care to patients, regardless of their ability to pay." Accepting all of that as true, NCHC exists to provide healthcare, not education, to underserved populations.

It is true that NCHC's COI lists several educational purposes, including "[t]o advance the health status of the region's population through . . . programs of education"; "[t]o conduct and support research in the area of . . . health education;" "[t]o provide educational programs for resident-physicians, medical nursing students, and members of other health care professions;" and "[t]o conduct or support health care educational programs for health care providers, health care managers and general public."

But courts "are not bound by[] the purposes set forth in the organization's certificate of incorporation. Otherwise, every non-profit

21

corporation 'could unilaterally insulate itself from tort liability merely by'"

including the word "education" repeatedly in its certificate of incorporation.

Green, 237 N.J. at 537 (citation omitted) (quoting DeVries v. Habitat for

Human., 290 N.J. Super. 479, 484 (App. Div. 1996)).

And even NCHC's COI reveals that its core purpose is to provide

healthcare. The COI's first listed purpose is "[t]o provide comprehensive

primary health services including the services of physicians, physician's

assistants, nurse clinicians and other health providers; dental services,

diagnostic laboratory and radiologic services, preventive health services . . . ,

[and] emergency medical services . . . required for adequate patient care." The

second listed purpose is "[t]o provide as appropriate supplemental health

services, including hospital services, home health services, extended care

facilities services, rehabilitative services . . . and long term physical medicine,

dental services, [and] vision services." The COI then lists several other forms

of medical care before getting to "health education services."

In any event, the essential inquiry is not what a nonprofit corporation

says, but what it does. Here, the undisputed evidence reveals that NCHC

exists to provide healthcare to underserved populations.

Neither NCHC's argument that it "promotes, creates, and sponsors

monthly outreach events to educate and inform the community on pressing

healthcare topics," nor the seven flyers that NCHC submitted to the trial court, change that reality. As an initial matter, free rapid HIV testing, back-to-school immunizations, and back-to-school physicals likely constitute healthcare services, not education. And the flyers advertising events for Black Maternal Health Week, World AIDS Month, Colorectal Cancer Awareness Month, Women's Health, and COVID-19 do not detail any education provided. Even if they did, monthly educational events would not turn a federally qualified health center that exists to provide medical services into an educational institution.[4]

Neither is NCHC organized exclusively for charitable purposes. NCHC fails any source-of-funding analysis because almost none of its revenue comes from charitable contributions.[5] As per NCHC's 2019 tax return, out of total revenue of $33,819,482, just $102,988, or 0.3%, came from charitable fundraising events or other contributions, gifts, and grants. Although we have

---

[4] At oral argument, counsel for NCHC claimed for the first time that during every appointment, doctors educate patients about health conditions, treatment plans, and taking medications. As examples of such education, counsel quoted statements including "take two aspirin and call me in the morning," and "you are due for your mammogram." Because this argument was never raised to the trial court, to the Appellate Division, or in briefing before us, we decline to address it. See, e.g., State v. Robinson, 200 N.J. 1, 19-20 (2009).

[5] As earlier noted, New Jersey courts have traditionally used a source-of-funding analysis for entities claiming to be organized exclusively for charitable purposes, and neither party challenges its use here.

23

never articulated a specific level of charitable contributions that is required, like the Appellate Division in <u>Abdallah</u>, we find 0.3% of revenue from charitable donations to be "too insignificant to have any effect on the charitable-status determination." 351 N.J. Super. at 288.[6]

Rather, we find that NCHC is organized exclusively for hospital purposes under Sections 7(b) and 8. As earlier noted, NCHC exists to provide healthcare to underserved populations. It currently runs seven locations that provide "a full range of medical and dental services for children, adults, and seniors." As its COO testified, it is a federally qualified health center "delivering primary care to patients, regardless of their ability to pay." That fits comfortably within <u>Kuchera</u>'s definition of "hospital purposes." As we explained in <u>Kuchera</u>, a modern hospital is "organized to engage in a series of activities relating to the improvement of human health and the provision of care to the sick, injured, and disabled." 221 N.J. at 252-53. That describes NCHC's work perfectly.

We recognize that NCHC is not owned or operated by a hospital, whereas the Family Health Center in <u>Kuchera</u> was part of the Meridian Health

---

[6] Because we hold that NCHC is not organized exclusively for charitable purposes, we do not address Smith's contention that, because Medicare was billed and paid for her treatment, she was not a beneficiary of any charitable works, but rather a paying consumer of healthcare services.

24

system and was located next door to the Jersey Shore University Medical Center. However, Sections 7(b) and 8 do not apply only to nonprofit corporations organized exclusively "as hospitals" -- they apply to nonprofit corporations organized exclusively "for hospital purposes." Pursuant to our broad reading of "hospital purposes" in Kuchera, NCHC is so organized. It is therefore entitled to the $250,000 cap on damages set forth in Section 8.[7]

## V.

We hold that NCHC is not entitled to charitable immunity under N.J.S.A. 2A:53A-7(a) as an entity organized exclusively for educational or charitable purposes, and is instead organized exclusively for hospital purposes under N.J.S.A. 2A:53A-7(b) and 8. The judgment of the Appellate Division is reversed and remanded for further proceedings.

---

[7] NJAJ, but no party in this case, asserts that NCHC does not meet the definition of "hospital" in N.J.A.C. 8:43G-1.2 ("'Hospital' means an institution . . . which maintains and operates facilities for the diagnosis, treatment or care of two or more non-related individuals suffering from illness, injury or deformity and where emergency, out-patient, surgical, obstetrical, convalescent or other medical and nursing care is rendered for periods exceeding 24 hours."). However, that definition is part of New Jersey's Hospital Licensing regulations, see N.J.A.C. 8:43G-1.1 to -38.6, promulgated pursuant to the Health Care Facilities Planning Act, see N.J.S.A. 26:2H-5(b). Nothing in the plain language or legislative history of the CIA references either the Act or its implementing regulations. The definition is thus not relevant to the meaning of "hospital purposes" in the CIA.

25

CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, FASCIALE, NORIEGA, and HOFFMAN join in JUSTICE WAINER APTER's opinion.